(Nos. 67576, 67585 cons.—

THE BOARD OF EDUCATION OF CITY OF CHICAGO
*et al.*, Appellees, v. A, C AND S, INC., *et al.*, Appel-
lants.

*Opinion filed October 25, 1989.*

430

Novack & Macey, of Chicago (Stephen Novack and P. Andrew Fleming, of counsel), for appellant A, C and S, Inc.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Daniel J. Cheely, Steven R. Ayres and Corinne Seither, of counsel), for appellant Fiberboard Corp.

Nolan, O'Malley & Dunne, of Chicago (S. Robert Depke and Michael J. Nolan, of counsel), for appellant Thompson-Hayward Chemical Co.

Schiff, Hardin & Waite, of Chicago (Robert H. Riley, Catherine Masters Epstein and Andrea E. Lodahl, of counsel), for appellant Owens-Illinois, Inc.

Katten, Muchin & Zavis, of Chicago (James C. Murray, Jr., Patrick J. Lamb and Kirk T. Hartley, of counsel), for appellant GAF Corp.

Haskell & Perrin, of Chicago (Edward Matushek III

and Jerome Duchowicz, of counsel), for appellant A & M Insulation, Inc.

Arnstein, Gluck, Lehr & Milligan, of Chicago (Patrick F. Geary and Terri L. Bartelstein, of counsel), for appellants Hill-Behan Lumber Co. and J.J. Barney Lumber Co.

Schroeder & Seeley, Ltd., of Geneva (John L. Schroeder and Therese S. Seeley, of counsel), for appellant Wilkin Insulation.

Rooks, Pitts & Poust, of Chicago (Douglas P. Roller, William D. Seith and Tamara A. Capello, of counsel), for appellant Dana Corp.

Rooks, Pitts & Poust, of Chicago (Kathy A. Smith, John G. Poust and Jill M. Rappis, of counsel), for appellant Chicago Fire Brick Co.

Sachnoff, Weaver & Rubinstein, Ltd., of Chicago (Arnold A. Pagniucci, Steven H. Cohen and Stuart A. Chanen, of counsel), for appellant Eagle-Picher Industries, Inc.

Tressler, Soderstrom, Maloney & Priess, of Chicago (Patrick E. Maloney and Stephen T. Grossmark, of counsel), for appellant Flintkote Co.

McDermott, Will & Emery, of Chicago (Gary Jackson and Lawrence E. Zabinski, of counsel), for appellants Georgia-Pacific Co. and Uniroyal, Inc.

Pretzel & Stouffer, Chtd., of Chicago (Neil K. Quinn and John V. Smith II, of counsel), for appellant Lake Asbestos of Quebec, Ltd.

Chadwell & Kayser, Ltd., of Chicago (J. Michael Newton and Erica A. Munzel, of counsel), for appellant Raymark Industries, Inc.

McDermott, Will & Emery, of Chicago (Steven P. Handler, Maureen A. Murphy and Janet M. Koran, of counsel), for appellant Cassiar Mining Corp.

Kiesler & Berman, of Chicago (Robert Kiesler and Cynthia A. Meister, of counsel), for appellant Illinois Insulation & Construction Co.

John B. Grogan, Ltd., of Chicago (Susan Gunty, of counsel), for appellant Grant-Wilson, Inc.

Gorham, Metge, Bowman & Hourigan, of Chicago (Edward H. MacCabe and Christopher A. Kreid, of counsel), for appellant John J. Moroney & Co.

Burke, Bosselman & Weaver, of Chicago (Victor P. Fillippini, Jr., Keith A. Klopferstein, Edward F. Ryan and Mark A. Stang, of counsel), for appellant Union Carbide Corp.

Michael P. Connelly, Bruce C. Howard and John R. Ostojic, of Connelly, Mustes & Palmer, of Chicago, for appellants Carey-Canada, Inc. and The Celotex Corp.

Schoen & Smith, Ltd., of Chicago (David Smith, of counsel), for appellant Pittsburgh-Corning Corp.

Kirkland & Ellis, of Chicago (John H. Morrison and James H. Gale, of counsel), for appellant Pfizer, Inc.

Pellett, Lundblad & Baker, of Chicago (Robert L. Martier, of counsel), for appellant Owens-Corning Fiberglas Corp.

O'Brien, Redding & Hyde, of Chicago (James M. Domer, of counsel), for appellant M. Mauritzon & Co.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Gilbert J. Rogers and Terence R. Selby, of counsel), for appellant Armstrong World Industries, Inc.

Kurnik & Cipolla, of Arlington Heights (Thomas Platt, of counsel), for appellant Nicolet Industries, Inc.

O'Connor & Schiff, of Chicago (Neil D. O'Connor and William C. Brittan, of counsel), for appellant Iten Industries.

Edward Melia and George F. Fitzpatrick, Jr., of Wildman, Harrold, Allen & Dixon, of Chicago, for appellants CertainTeed Corp. and Combustion Engineering, Inc.

John J. Verscaj, of Bell, Boyd & Lloyd, of Chicago, for appellant W.R. Grace & Co.

Jack T. Riley, Jr., of Johnson, Cusack & Bell, of Chicago, for appellant Proko Industries, Inc.

Eugene E. Gozdecki, of Gozdecki, Zido & Behnke, of Chicago, for appellant C. Tennant Sons & Co. of New York.

Thomas R. Meites, Lynn Sara Frackman, Michael M. Mulder and Joan H. Burger, of Meites, Frackman & Mulder, of Chicago, for appellee Evanston Community Consolidated School.

Patricia Whitten, Susan Einspar-Wayne and Karen Gatsis Anderson, of Chicago, of counsel, for appellee Chicago Board of Education.

John H. Hager and Elaine K.B. Siegel, of Hager & Collins, of Chicago, for appellee Board of Education of Township High School District No. 211.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, of Chicago, and Marilyn A. Kueper and Rosalyn B. Kaplan, Assistant Attorneys General, of Springfield, of counsel), for *amicus*

*curiae* Attorney General of the State of Illinois.

JUSTICE RYAN delivered the opinion of the court:

The issue presented in this case is whether the plaintiffs, 34 school districts, have sufficiently pleaded a cause of action to recover the removal and repair costs of asbestos-containing material (ACM) in their buildings from the various defendants who are or were involved at some level of the manufacturing and distribution chain of ACM. The circuit court of Cook County granted the defendants' motion to dismiss each of the 13 causes of action alleged in the plaintiffs' complaints. The appellate court affirmed as to the concert of action and implied cause of action under the Asbestos Abatement Act (Ill. Rev. Stat. 1987, ch. 122, par. 1401 *et seq.*), but reversed on the strict liability, negligence, intentional and negligent misrepresentation, restitution, consumer fraud and breach of warranty counts. (171 Ill. App. 3d 737.) The remaining four counts were not raised on appeal. We agree with the appellate court that these complaints allege sufficient facts to survive a motion to dismiss as to the negligence, strict liability and negligent misrepresentation counts, but affirm the trial court's dismissal of the other counts.

This case involves three consolidated complaints filed in the circuit court of Cook County by the board of education of the City of Chicago, Evanston Community Consolidated School District No. 65, along with several suburban school districts, and the boards of education of Township High School Districts Nos. 211 and 207. There are 78 named defendants, ranging from lumber yards to multinational corporations. These business entities are alleged to "have been and/or are now engaged in the mining, manufacturing, marketing, sales and/or installation of asbestos, asbestos materials and/or friable asbestos materials."

The complaints were filed following the enactment of the Asbestos Abatement Act (Ill. Rev. Stat. 1985, ch. 122, par. 1401 *et seq.*). The Act requires schools throughout the State to identify, contain and remove all asbestos materials that constitute a significant health hazard, and to repair or maintain asbestos materials that do not pose a significant health hazard in the schools. (Ill. Rev. Stat. 1987, ch. 122, par. 1402(d).) The Act directs that funding for this project includes "appropriations from the General Revenue Fund, proceeds from litigation against manufacturers, distributors and contractors of asbestos products, funds provided under the provisions of the federal Asbestos School Hazard Abatement Act of 1984, or any combination thereof." (Ill. Rev. Stat. 1987, ch. 122, par. 1409.) In anticipation of spending "substantial sums of money" to correct the conditions and comply with the Act, these plaintiffs brought suit seeking damages for the cost of such efforts.

The trial court held the complaints failed to allege sufficient facts to withstand the defendants' motion to dismiss and, further, that they were barred by the statute of limitations. Therefore, each of the 13 counts which were argued before the court was dismissed. The plaintiffs' appeal was based on nine of the causes of action. The appellate court ruled that the complaint pleaded sufficient facts for a cause of action in strict products liability, negligence, negligent and fraudulent misrepresentation, restitution, and breach of warranty, and for a cause of action based on "An Act to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices ***" (Ill. Rev. Stat. 1985, 121½, par. 261 *et seq.*) (hereinafter the Consumer Fraud Act), and that the school districts were exempt in these causes of action from the appropriate statutes of limitations. The court also held there was no private cause of

action based on the Asbestos Abatement Act (Ill. Rev. Stat. 1985, ch. 122, par. 1401 *et seq.*), and that the concert of action claim was properly dismissed. The defendants appeal, in this court, as to the reinstatement of the eight causes of action and the plaintiffs cross-appeal the dismissal of the private right of action under the Asbestos Abatement Act.

While notice pleading prevails under the Federal rules, a civil complaint in Illinois is required to plead the ultimate facts which give rise to the cause of action. (*People ex rel. Scott v. College Hills Corp.* (1982), 91 Ill. 2d 138, 145.) Upon a motion to dismiss, all facts properly pleaded in the complaint are accepted as true and all reasonable inferences are drawn in favor of the nonmovant. (*Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, 148; *United Air Lines, Inc. v. CEI Industries of Illinois, Inc.* (1986), 148 Ill. App. 3d 332, 336.) "To see if a cause of action has been stated the whole complaint must be considered, rather than taking a myopic view of a disconnected part." (*People ex rel. Scott v. College Hills Corp.*, 91 Ill. 2d at 145.) This court has held that a cause should not be dismissed on the pleadings unless it clearly appears that no facts can be proved which will entitle plaintiff to recover. (*Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 506.) This is a broad statement and is generally correct; however, it should not be construed as an adoption of notice pleading by this court.

Each of the three complaints essentially allege the same facts; in fact, the Chicago and Evanston complaints are nearly identical. The trial court, therefore, based its rulings using the Chicago complaint as the court's outline. Preliminarily, the facts alleged which are common to each count are that asbestos is a known carcinogen which can lead to lung cancer and other serious diseases; a disturbance or deterioration of ACMs causes

the release of asbestos fibers into the air, where they may remain for long periods of time; defendants obscured medical and scientific data as to the link between asbestos and disease; defendants ignored and failed to act upon available medical and scientific data; by failing to warn, the defendants induced plaintiffs to purchase large quantities of asbestos products between 1946 and 1972; and the failure to warn deprived plaintiffs of a knowledgeable choice of alternatives. Plaintiffs admit that it may be impossible to identify a specific defendant with the products in a specific school, but allege that the existence of asbestos products in the schools continues to present a danger to the health and welfare of students, school personnel and others. It is also alleged that undertaking the corrective action required in the Asbestos Abatement Act will be very costly.

## STRICT LIABILITY AND NEGLIGENCE

The first two causes of action sound in tort—strict products liability and negligence. The parties and both the appellate and circuit courts dealt with the sufficiency of these counts together. The linchpin for both of these causes is whether the complaints sufficiently allege that asbestos has caused damage to other property or injury to persons so as to fall within a tort claim, as opposed to a contract cause of action. The defendants contend that the plaintiffs have, if anything, only suffered economic loss, which is recoverable in contract and not in tort. They argue that there is only alleged a risk of harm to people and no actual harm is pleaded. Further, they contend that no property damage is alleged in the complaint. The plaintiffs counter that there is alleged property damage to the extent that the buildings are contaminated with a toxic substance which renders them unsafe for their normal use. Both sides agree that the principles established in *Moorman Manufacturing Co. v.*

*National Tank Co.* (1982), 91 Ill. 2d 69, and its progeny govern these counts, and we shall deal with them together in determining whether the complaints sufficiently allege a tort claim to survive the motion to dismiss. See *Moorman*, 91 Ill. 2d at 88 ("The policy considerations against allowing recovery for solely economic loss in strict liability cases apply to negligence actions as well").

We concluded, in *Moorman*, that when a defect in a product is qualitative in nature and relates to a consumer's expectation that the product is of a particular quality, resulting in economic loss but no personal injury or property damage, then the plaintiff has a claim for contract damages but not a tort action. (*Moorman*, 91 Ill. 2d at 88.) The court stated:

> "[W]hen a product is sold in a defective condition that is unreasonably dangerous to the user or consumer or to his property, strict liability in tort is applicable to physical injury to plaintiff's property, as well as to personal injury. When an unreasonably dangerous defect is present, such as the truck's nonfunctioning brakes in *Seely*, and physical injury does, in fact, result, then '[p]hysical injury to property is so akin to personal injury that there is no reason to distinguish them.' (*Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 19, 403 P.2d 145, 152, 45 Cal. Rptr. 17, 24. See Prosser I, 69 Yale L.J. 1099, 1143 (1960); Restatement (Second) of Torts sec. 402A (1965).) This comports with the notion that the essence of a product liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property. On the other hand, contract law, which protects expectation interests, provides the proper standard when a qualitative defect is involved, *i.e.*, when a product is unfit for its intended use. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.* (3d Cir. 1981), 652 F.2d 1165, 1169. See *Seely v.*

*White Motor Co.* (1965), 63 Cal. 2d 9, 19, 403 P.2d 145, 152, 45 Cal. Rptr. 17, 24." *Moorman,* 91 Ill. 2d at 81-82.

The demarcation between tort recovery for physical harm and a contract recovery for economic losses usually depends on (1) the nature of the defect and (2) the manner in which the damage occurred. (*Moorman,* 91 Ill. 2d at 82.) As stated, the defect in a tort claim results in either personal injury or property damage. (*Moorman,* 91 Ill. 2d at 81.) Whereas, in the economic loss doctrine, the defect results in damages for the inadequate value of the product, costs of repair and replacement of the defective product, loss of profits, as well as diminution in the value of the product because of its inferior quality and failure to work for the general purposes for which it was manufactured and sold. (*Moorman,* 91 Ill. 2d at 82.) Typically, the manner in which a tort damage occurs is an accident involving some violence or collision with external objects. Damage resulting from deterioration, internal breakage or other nonaccidental causes most likely invokes contract law. *Moorman,* 91 Ill. 2d at 83, quoting Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum. L. Rev. 917, 918 (1966).

These principles have been applied and further examined in a number of cases since 1982. In *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, because the plaintiff's home was built on loose soil, the chimney and adjoining wall began to pull away from the house. We rejected the negligence claim, reasoning that there must be a showing of harm above and beyond disappointed expectations, and that while his commercial expectations were not met, "the only danger to the plaintiff is that he would be forced to incur additional expenses for living conditions that were less than what was bargained for." (*Redarowicz,* 92 Ill. 2d at 177-78.) Subsequently, the court dismissed the tort claim in three other cases. (*Foxcroft Townhome Owners Association v. Hoffman Rosner Corp.*

(1983), 96 Ill. 2d 150 (complaint for damages resulting from negligent installation and use of defective siding on a condominium did not allege physical injury, damage to other property, or that damage to the defective product itself was due to a sudden and dangerous occurrence); *Morrow v. L.A. Goldschmidt Associates, Inc.* (1986), 112 Ill. 2d 87 (numerous allegations of faulty workmanship in construction of townhouses; however, no allegation of physical injury or damage to property other than to the townhouses themselves); *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146 (plaintiff incurred additional costs in redoing defendant's allegedly negligent performance of electrical work).) Twice we have applied the *Moorman* doctrine and held that a cause of action has been pleaded in tort. *Vaughn v. General Motors Corp.* (1984), 102 Ill. 2d 431 (defective brakes caused sudden and calamitous event, resulting in truck and its load overturning); *Scott & Fetzer Co. v. Montgomery Ward & Co.* (1986), 112 Ill. 2d 378 (defective fire-warning system contributed to fire spreading throughout a warehouse, causing extensive damage to property).

The plaintiffs try to construe language in *Redarowicz* and *Morrow* to the effect that an allegation of risk is "a major factor in distinguishing economic loss from tortious injury to property." The appellate court also adopted this as a third element in the *Moorman* inquiry. We do not believe that it is a proper extension of those cases to read into them risk alone as an element of inquiry. Each case had in *dicta* a statement regarding risk of physical injury. (*Redarowicz*, 92 Ill. 2d at 177-78, quoting *Crowder v. Vandendeale* (Mo. 1978), 564 S.W.2d 879, 882; *Morrow*, 112 Ill. 2d at 98.) However, such statements should not distract from their holdings which reinforced the necessity of physical damage to other property or personal injury, not merely a risk of injury or

damage. Though it is true that to recover in strict products liability there must be a defective condition which is unreasonably dangerous, there must also be physical harm caused by that product. The dangerousness which creates a risk of harm is insufficient standing alone to award damages in either strict products liability or negligence.

This risk analysis is apparently derived from *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.* (3d Cir. 1981), 652 F.2d 1165 (applying Pennsylvania law). In *Pennsylvania Glass*, a front-end loader was extensively damaged when a fire suddenly broke out in the front portion near the hydraulic lines. The court delineated the line between tort and contract by analyzing such factors "as the nature of the defect, the type of risk, and the manner in which the injury arose." (*Pennsylvania Glass*, 652 F.2d at 1173.) In upholding the tort cause of action, the court stated:

> "[T]he nature of the defect and the type of risk it poses are the guiding factors. Here, the damage to the front-end loader was the result of a fire—a sudden and highly dangerous occurrence. [Citations.] Moreover, the alleged defect—a faulty design that failed to contain the fire and led to greatly enhanced damage—constitutes a safety hazard that posed a serious risk of harm to people and property. Thus, the complaint brought by PGS appears to fall within the policy of tort law that the manufacturer should bear the risk of hazardous products." *Pennsylvania Glass*, 652 F.2d at 1174-75.

Though *Moorman* cited with approval *Pennsylvania Glass*, it was for the proposition that a tort action was not proper when seeking recovery for economic losses alone. (*Moorman*, 91 Ill. 2d at 85.) *Moorman* involved a grain storage tank which cracked. The plaintiff claimed there was a cause of action in strict products liability, due in part to the risk of physical harm:

"Plaintiff argues that economic loss is not sought in this case. It asserts in its brief that a product defect existed that posed an 'extreme threat to life and limb, and to property of plaintiff and others, a defect which resulted in a sudden and violent ripping of plaintiff's tank, and which only fortunately did not extend the full height of the tank.' " (*Moorman*, 91 Ill. 2d at 82.)

In rejecting the tort claim, we stated that allegations of the unreasonably dangerous nature of the product are insufficient in tort when neither personal injury nor property damage is involved. *Moorman*, 91 Ill. 2d at 77.

While *Pennsylvania Glass* relied on risk in its inquiry, the validity of this element when analyzing the demarcation between tort and contract is suspect even in its own jurisdiction. Subsequent to the decision, the Supreme Court, sitting in admiralty, held that a manufacturer in a commercial relationship has no duty under tort theories to prevent a product from injuring itself. (*East River Steamship Corp. v. Transamerica Delaval Inc.* (1986), 476 U.S. 858, 871, 90 L. Ed. 2d 865, 877, 106 S. Ct. 2295, 2302.) The Court adopted in principle the rule of *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17, which precludes courts from imposing tort liability on a manufacturer if a defective product injures only itself. The Court labeled the *Pennsylvania Glass* formulation as an intermediate approach and rejected it as unsatisfactory. (*East River*, 476 U.S. at 870, 90 L. Ed. 2d at 876, 106 S. Ct. at 2301-02 ("[t]he intermediate positions, which essentially turn on the degree of risk, are too indeterminate to enable manufacturers easily to structure their business behavior").) The Third Circuit has since followed the Supreme Court's view and repudiated its position in *Pennsylvania Glass*. (*Aloe Coal Co. v. Clark Equipment Co.* (3d Cir. 1987), 816 F.2d 110, 111 (noting that the Supreme Court specifically rejected the *Pennsylvania Glass* position, pre-

dicted "that Pennsylvania courts, although not bound to do so, would nevertheless adopt as state law the Supreme Court's reasoning").) We have previously rejected this intermediate position and believe that it was improper for the appellate court to utilize it in this case.

Perhaps it is difficult, and may appear somewhat artificial, to fit a claim for asbestos damage within the framework which has been established for more traditional tort or contract actions. Indeed, the nature of the "defect" and the "damage" caused by asbestos is unique from most of the cases we have addressed. Nonetheless, we do believe that this complaint has alleged sufficient facts to establish a tort action under the principles established in *Moorman*; however, the holding in this case should not be construed as an invitation to bring economic loss contract actions within the sphere of tort law through the use of some fictional property damage.

The nature of the defect in these ACMs is the asbestos fibers, which are toxic and which, it has been determined, may, in certain circumstances, be harmful. (See *Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195 (asbestos worker contracted asbestosis); Asbestos School Hazard Abatement Act of 1984, 20 U.S.C.A. §4011(a)(1) (Supp. 1989) ("exposure to asbestos fibers has been identified over a long period of time and by reputable medical and scientific evidence as significantly increasing the incidence of cancer and other severe or fatal diseases, such as asbestosis"); Ill. Rev. Stat. 1985, ch. 122, par. 1402(b) (Asbestos Abatement Act; exposure to asbestos fibers linked to asbestosis, bronchogenic carcinoma, mesothelioma and other malignancies); 83d Ill. Gen. Assem., Senate Proceedings, May 22, 1984, at 106-07 (statements of Senator Berman) (extensive testimony heard regarding the hazards of friable asbestos); Comment, *Recovery for Risk Comes of Age: Asbestos in Schools and the Duty to Abate a Latent En-*

*vironmental Hazard*, 83 Nw. U.L. Rev. 512, 514 n.18 (1989) (school children are particularly vulnerable to asbestos exposure).) It is alleged in these complaints that friable asbestos exists in plaintiffs' buildings and asbestos has been released throughout the schools. We need not, in ruling on this motion to dismiss, determine whether the amounts of friable asbestos which exist in the buildings are harmful. Our focus is to take as true the facts alleged in the complaints and determine whether they sufficiently state a claim.

We conclude that it would be incongruous to argue there is no damage to other property when a harmful element exists throughout a building or an area of a building which by law must be corrected and at trial may be proven to exist at unacceptably dangerous levels. The view that asbestos fibers may contaminate a building sufficiently to allege damage to property has been recently adopted in a number of cases. A claim of property damages to the city hall of Greenville, South Carolina, caused by asbestos contamination was held actionable in tort in *City of Greenville v. W.R. Grace & Co.* (4th Cir. 1987), 827 F.2d 975. In *City of Greenville*, ACM was attached to steel beams in the building. The negligence action survived a motion to dismiss, and at trial, evidence was presented establishing its defective nature and that asbestos fibers had been released into ceiling tiles, ventilation and elevator shafts, carpets and computer equipment. The jury held in favor of the city and awarded damages. On appeal, the court held that the property damage alleged was sufficient for a tort action. In affirming the denial of a judgment notwithstanding the verdict, the court held that from the evidence presented the jury could have reasonably found that the product was unreasonably dangerous and defective and "that the city hall was contaminated by significant

amounts of asbestos." *City of Greenville*, 827 F.2d at 980.

In *City of Manchester v. National Gypsum Co.* (D.R.I. 1986), 637 F. Supp. 646, the city sued, seeking damages for removal and replacement of asbestos products from 16 schools and other public buildings. In applying New Hampshire State law to determine whether sufficient property damage was alleged for a tort action, the court focused on the nature of the defect and the manner in which the damages occurred. The complaint alleged that the hazardous asbestos products contaminated the buildings and the objects in them in a way which made them harmful to the users. More specifically, the asbestos "purportedly contaminated the ceilings, walls, floors, furniture, drapes, and air quality of the buildings," and as such made them harmful to the users. (637 F. Supp. at 651.) The court found that the plaintiff made a sufficient allegation of physical harm to its property to state a claim for negligence and strict liability and was entitled to offer evidence to support the claims. *City of Manchester*, 637 F. Supp. at 652.

The ACM in *Town of Hooksett School District v. W.R. Grace & Co.* (D.N.H. 1984), 617 F. Supp. 126, was used as acoustical insulation and for fireproofing the plaintiff's school buildings. In denying the defendant's motion to dismiss, the court accepted the school district's argument that the asbestos fibers were released into the school's atmosphere, thus contaminating the air, the carpeting, the curtains, other school furnishings, personnel and occupants. Though the court also cited *Pennsylvania Glass* for the proposition that the product created an unreasonable risk of injury to the person and property, we believe that, apart from that, the court found asbestos fibers may constitute property damage via contamination of a building. (See also *Shooshanian v. Wagner* (Alaska 1983), 672 P.2d 455 (allegation that urea formaldehyde

foam insulation in plaintiff's building released a toxic substance which resulted in physical damage to property was sufficient to state a cause of action in tort).) Each party before us has attached a number of trial court opinions from around the country addressing whether there is a cause of action in tort. Though we find it unnecessary to cite each case, we do note that the majority have found there is a tort action stated; however, we do not necessarily agree with the legal reasoning in some of the cases.

The plaintiffs' complaints before us are not nearly as specific as the cases we have just discussed as to whether they allege personal injury or property damage, or to what extent the property has been damaged. In addition to the general allegations in the complaint, in the strict liability count they allege that the ACM was used for fireproofing, insulation and decorative purposes. They do not contend that it has failed to adequately perform these functions. However, they do contend that it was unreasonably dangerous and defective in that it was incapable of being made safe for its ordinary and intended uses. They also allege that they were not warned of the risks and dangers of ACM. Further, in the negligence count, they allege that the defendants failed to adequately test asbestos materials; the defendants failed to adequately inform the plaintiffs of the dangers involved; the omission to inform induced plaintiffs to purchase the products; and defendants knew or should have known that the presence of the carcinogenic asbestos in a readily releasable form poses a risk to the persons who use the facilities.

Included in the pleadings are citations to the Asbestos Abatement Act. The Act states that if there is friable asbestos in educational facilities, corrective action must be taken. (Ill. Rev. Stat. 1985, ch. 122, par. 1404.) In the complaints, friable asbestos material is defined as

"asbestos material applied onto ceilings, walls, structural members, piping, ductwork or any other part of the building structure which, when dry, may be crumbled, pulverized or reduced to powder by hand pressure." It is in this form that asbestos may become airborne and eventually find its way into other places within the building or into humans. One complaint alleges that "[a]sbestos in the school buildings has become, is becoming and/or will become separated from some or all of the asbestos products and also airborne." The complaints state that this friable asbestos exists throughout their "educational facilities." Educational facilities in turn has a broad definition which includes classrooms, libraries, kitchens, auditoriums, and maintenance facilities. Thus, the Act states that if there is friable asbestos in the facilities corrective action must be taken, and these complaints allege that throughout their facilities this toxic substance exists. Nevertheless, the defendants still claim that in the complaint there is no allegation of contamination of the building and, therefore, no claim for property damage has been made. We believe that making a reasonable inference from these pleadings it is sufficiently stated that harmful asbestos exists throughout the buildings, similar to a claim for contamination. The essence of the allegations is that the buildings have been contaminated by asbestos to the point where corrective action, under the law, must be taken. Thus, the buildings have been damaged.

*Moorman* also stated that an inquiry into the manner in which the damages occurred is helpful in delineating between contract and tort actions. Though we noted that an accident involving some violence or collision with external objects which results in physical damage will most likely be treated as a tort action, it is not critical to a strict products liability action that a sudden and calamitous event occurred. (*East River Steamship Corp. v.*

*Transamerica Delaval Inc.* (1986), 476 U.S. 858, 870, 90 L. Ed. 2d 865, 876, 106 S. Ct. 2295, 2302.) As stated, asbestos damages do not easily fit within the framework delineating tort and contract, and it is evidenced in this prong of *Moorman.* However, we believe that the critical inquiry in this instance is whether the product has an unreasonably dangerous defect and whether the defect caused the property damage alleged. To prevent recovery in tort merely because the physical harm did not occur suddenly would defeat the underlying purposes of strict products liability. See Restatement (Second) of Torts §402A, Explanatory Notes, comment *c*, at 349-50 (1965) (the purpose of products liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons); *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 18, 403 P.2d 145, 151, 45 Cal. Rptr. 17, 23 (a manufacturer can be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm); *Moorman*, 91 Ill. 2d at 77-83.

In ruling on the motion to dismiss the strict liability action, the trial court found the plaintiffs' argument that the products were inherently dangerous and defective suspect in light of the fact that there has not been one claim of personal injury, nor did the plaintiffs see fit to remove the ACMs from their schools even though information relating to the hazards of ACM has existed for years. We agree with the appellate court that the fact that a property owner may chose to live with the product in its allegedly defective condition is relevant to assumption of the risk and comparative fault, neither of which is at issue in this appeal. (See *Vaughn v. General Motors Corp.*, 102 Ill. 2d at 437.) Further, the trial court concluded that it was not established that low-level as-

bestos exposure in a nonoccupational setting is a defect likely to cause harm or that it poses any risk of physical harm. However, the danger point of asbestos exposure is an issue of proof appropriate for a jury, and it does not affect our holding that these complaints allege actionable damage to other property.

In regard to the strict products liability count, the trial court ruled that the ACMs were components and indivisible parts of the building and as such were not a product for strict liability purposes. An item will be considered a product for purposes of the cause of action if to do so will effectuate the policy basis for imposing strict liability in tort. (*Hammond v. North American Asbestos Corp.* (1983), 97 Ill. 2d 195, 204.) In *Hammond*, we held that raw asbestos was a product for the purposes of a strict liability action. (97 Ill. 2d at 205.) The ACMs involved in this case include acoustic plaster, acoustic tile, boiler insulation, pipe insulation and spray-on fireproofing. The fact that these are used in construction and have been installed in a building does not detract from their nature as products separate from the actual structure. We cannot accept the defendant's argument that these ACMs have become permanent fixtures upon real property, indistinguishable from the buildings themselves, and to do so would defeat the underlying policy reasons for imposing tort or recovery.

Our holding is not influenced by the fact that these ACMs performed the insulation or fireproofing purposes satisfactorily. A product may adequately perform its intended purposes yet still cause personal injury or damage to other property. Therefore, the plaintiffs should be given a chance to prove that friable asbestos exists within the buildings and that the remaining criteria, other than whether physical harm is alleged, for either a strict products liability or a negligence action exists.

## FRAUDULENT AND NEGLIGENT MISREPRESENTATION

The complaint next alleged causes of action for the common law torts of negligent and fraudulent misrepresentation. The trial court dismissed the negligent misrepresentation count because it found that the defendants were not in the business of supplying information for the guidance of others in their business transactions, and that recovery was precluded under the *Moorman* economic loss doctrine. As for the fraudulent misrepresentation count, the court held that the complaints did not allege sufficient facts to meet the higher burden placed on a plaintiff pleading this action and that this pleading obligation is not lessened by an allegation of conspiracy. It further held that an intent to deceive is not alleged and there is no actual injury claimed.

The elements for these two causes of action which a successful plaintiff must plead and prove are quite similar. In *Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, we formulated the elements in a fraudulent misrepresentation as: (1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance. Negligent misrepresentation has essentially the same elements, except that the defendant's mental state is different. The defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action. (See M. Polelle & B. Ottley, Illinois Tort Law 265 (1985).) For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information.

The defendants contend they did not breach any duty owed to the plaintiff because the complaint did not allege that they were in the business of furnishing information. The defendants argue that under "well-established Illinois law," it is an essential element of the tort of negligent misrepresentation that the defendant be in the business of providing information. To support this contention, the defendants cite as the "holding" in *Moorman* "that a defendant may be liable for negligent misrepresentation if it 'is in the business of supplying information for the guidance of others in their business transactions' " and that this is the only instance where the cause of action will lie. Defendants next cite a number of appellate opinions which have required the defendant to be in the business of supplying information before a cause of action is stated. *Pasulka v. Koob* (1988), 170 Ill. App. 3d 191, 204 (representations during real estate transaction between private individuals); *Richmond v. Blair* (1985), 142 Ill. App. 3d 251, 257 (real estate action by buyer against the broker and seller); *Marino v. United Bank of Illinois, N.A.* (1985), 137 Ill. App. 3d 523, 528 (statement by mortgagee's attorney regarding liens on property at judicial foreclosure sale); *Perschall v. Raney* (1985), 137 Ill. App. 3d 978, 983 (faulty termite inspection report); *Grass v. Homann* (1984), 130 Ill. App. 3d 874, 879 (faulty termite inspection report); *Knox College v. Celotex Corp.* (1983), 117 Ill. App. 3d 304, 307-08 (sale of roofing material which did not meet buyer's expectations); *Black, Jackson & Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.* (1982), 109 Ill. App. 3d 132, 135-36 (claims for lost profits, salaries, and office supplies due to failure of computer system).

In *Moorman*, we held that a manufacturer could not be held liable under a negligent misrepresentation theory for economic losses caused. (*Moorman*, 91 Ill. 2d at 89-

90.) In reaching this conclusion we discussed how economic loss is recoverable where a fraudulent representation is made and "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations (*Rozny v. Marnul* (1969), 43 Ill. 2d 54)." (91 Ill. 2d at 88-89.) In *Rozny*, we held that purchasers of residential housing could recover against a surveyor for the negligently inaccurate representations of the survey that caused economic loss to the purchasers even though no privity of contract existed between the purchasers and surveyor. We do not believe that *Moorman* and *Rozny* conclusively resolves the question of when and against whom a plaintiff may recover economic losses for a negligent misrepresentation. However, it is unnecessary in this case to resolve that issue because of our holding that the plaintiffs have suffered more than economic losses.

Nor do we find the appellate opinions which the defendant cites persuasive as to the issue before us because in those cases the plaintiffs suffered economic losses as a result of the defendant's alleged misrepresentation. Those courts were generally construing Restatement (Second) of Torts, section 552, which is entitled "Information Negligently Supplied for the Guidance of Others" (Restatement (Second) of Torts §552 (1977)). (See *Perschall v. Raney* (1985), 137 Ill. App. 3d 978, 984; *Black, Jackson & Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.* (1982), 109 Ill. App. 3d 132, 135; *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 81.) In light of our conclusion that the plaintiffs have alleged physical injury, we believe that the Restatement provision which more properly addresses the situation is section 311, entitled "Negligent Misrepresentation Involving Risk of Physical Harm" (Restatement (Second)

of Torts §311 (1965)). This provision is broader in its applicability and declares that one who gives false information to another may be liable for physical harm caused by actions taken by that person in justifiable reliance upon the information. (Restatement (Second) of Torts §311 (1965).) Our conclusion is supported by a reading of the comments for each section. Comment *a* of section 552 states:

> "Although liability under the rule stated in this Section is based upon negligence of the actor in failing to exercise reasonable care or competence in supplying correct information, the scope of his liability is not determined by the rules that govern liability for the negligent supplying of chattels that imperil the security of the person, land or chattels of those to whom they are supplied (see §§388-402), *or other negligent misrepresentation that results in physical harm. (See §311)*. When the harm that is caused is only pecuniary loss, the courts have found it necessary to adopt a more restricted rule of liability, because of the extent to which misinformation may be, and may be expected to be, circulated, and the magnitude of the losses which may follow from reliance upon it." (Emphasis added.) (Restatement (Second) of Torts §552, Explanatory Notes, comment *a*, at 127 (1977).)

The comments to section 311 confirm that it creates broader liability than do the rules of "liability for pecuniary loss resulting from negligent misrepresentation" which are stated in section 552. (Restatement (Second) of Torts §311, Explanatory Notes, comment *a*, at 106 (1965).) The rule of liability in section 311 extends to any defendant "who, in the course of an activity which is in furtherance of his own interests, undertakes to give information to another, and knows or should realize that the safety of the person of others may depend upon the accuracy of the information." (Restatement (Second) of Torts §311, Explanatory Notes, comment *b*, at 106 (1965).) In the complaints it is alleged that a negligent

representation was given that the ACMs were safe; however, the products have supposedly caused extensive property damage. Such an action falls within the parameters of section 311. Though the provision speaks generally in terms of physical harm and does not appear limited only to personal injury (see Restatement (Second) of Torts §311, Explanatory Notes, comment *c*, at 107 (in discussing information gratuitously given, it states that where "the harm which results is bodily harm to the person, or physical harm to the property of the one affected, there may be liability for the" negligently provided information); Illustration 8, at 108-09), we have held that the same policy reasons for imposing tort liability exist for physical harm, which is either personal injury or property damage. See generally *Moorman*, 91 Ill. 2d 69.

Though we hold that the defendants did have a duty not to be negligent in supplying information when reliance on such information might result in physical injury, the plaintiffs have significant hurdles to overcome upon remand. The pleadings in this count are very broad and unspecific. At trial plaintiffs will have to present proof of what representations were made to them and who made those representations. They must prove that the defendants knew or should have known of the dangerous propensity of the ACM and that the statements made were to induce the plaintiffs to purchase the products. Furthermore, depending on the plaintiffs' own knowledge, there may be an issue of whether during the whole time from 1946 through 1972 the plaintiffs were justified in relying on a belief that the products were safe. See *Schmidt v. Landfield* (1960), 20 Ill. 2d 89; M. Polelle & B. Ottley, Illinois Tort Law 287-90 (1985).

The Chicago and the Evanston complaints also included a count for fraudulent misrepresentation, which was dismissed on three different grounds. First, the cir-

cuit court ruled that the complaints failed to allege sufficient facts to meet the pleading requirements of a fraudulent misrepresentation claim.

The facts which constitute an alleged fraud must be pleaded with sufficient specificity, particularity and certainty to apprise the opposing party of what he is called upon to answer. (*Horan v. Blowitz* (1958), 13 Ill. 2d 126, 133; *People ex rel. Callahan v. Gulf, Mobile & Ohio R.R. Co.* (1956), 8 Ill. 2d 66, 70-71; M. Polelle & B. Ottley, Illinois Tort Law 263-64 (1985).) The pleadings must contain specific allegations of facts from which fraud is the necessary or probable inference. (*Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 322; *Goldberg v. Goldberg* (1981), 103 Ill. App. 3d 584, 588.) Even under the more lenient Federal rules, a claim of fraud must be stated with particularity. (Fed. R. Civ. P. 9(b).) The reason for this higher standard is "to protect against baseless complaints. This not only weeds out unmeritorious strike suits, but also protects defendants from the harm to their reputations that follows charges of serious wrongdoing." (*Helfant v. Lousiana & Southern Life Insurance Co.* (E.D.N.Y. 1978), 459 F. Supp. 720, 726.) Thus, a plaintiff must at least plead with sufficient particularity facts establishing the elements of fraud, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made. See *Horan v. Blowitz*, 13 Ill. 2d at 133; *People ex rel. Callahan v. Gulf, Mobile & Ohio R.R. Co.*, 8 Ill. 2d at 71-72; *Waterford Condominium Association v. Dunbar Corp.* (1982), 104 Ill. App. 3d 371, 376.

We agree with the conclusion of the trial court that these complaints do not contain sufficient particularity to survive a motion to dismiss. The allegations in the complaint are that the defendants represented the products were safe when they knew or should have known they were not; data was obscured regarding the hazards of

asbestos since the 1930s; plaintiffs were induced to use the products while being deprived of information necessary to make a knowledgeable choice; and defendants were members of an association that discouraged research and publication concerning the relationship between asbestos and cancer starting in the 1950s.

These complaints do not allege with specificity, certainty and particularity the facts necessary to state a cause of action in fraud. Included within the information which is lacking are facts as to who was involved, what occurred and how this induced the plaintiffs to act or misrepresented the products' safety, and when these acts occurred. Instead of attributing actions to any particular defendant or group of defendants, the plaintiffs claim that numberless and nameless agents, servants and employees of unspecified defendants partook in this fraudulent activity. There are 78 named defendants and 26 unnamed ones involved in this litigation. The defendants range from multinational corporations to lumber yards and represent all stages of production and distribution. Nonetheless, the plaintiffs alleged that they all were involved in the fraud and cover-up. This nebulous group of defendants is also alleged to be part of an industry association and this association somehow discouraged research and dissemination of information about their products. This discouragement occurred in the 1950s and presumably exists today. Furthermore, one or more of the defendants are alleged to have acted in concert as to some or all of the conduct constituting fraud. The time periods involved are especially vague. The complained-of actions presumably began in the early 1900s and continued through to an unspecified date. During this whole time, surely numerous businesses entered and left the asbestos business, yet they all are alleged to have been involved in the fraudulent scheme. Nor is it alleged that the plaintiffs would have acted differently with more in-

formation or with the knowledge that the products may release a toxic substance which at high levels could be dangerous.

In order to circumvent the pleading requirements, the plaintiffs claim that a conspiracy by the defendants impedes the ability to allege specific facts. It should be noted that in the complaints, plaintiffs included conspiracy as a separate cause of action. This count too was dismissed and plaintiffs did not seek a review of that dismissal. The appellate court agreed with the plaintiffs that the allegations of an industry conspiracy abrogated the particularity requirements in pleading fraudulent misrepresentation. In support of this conclusion, the appellate court cited *People ex rel. Scott v. College Hills Corp.* (1982), 91 Ill. 2d 138. *Scott* involved an antitrust conspiracy case and does not stand for the proposition that when pleading conspiracy the allegations for a fraud are more lenient. Though it is true that alleging the facts necessary for a conspiracy cause of action may be difficult (*People ex rel. Scott v. College Hills Corp.* (1982), 91 Ill. 2d 138, 145-47), we are not dealing with such an action; instead, the plaintiffs are claiming fraudulent misrepresentation and therefore must meet the pleading requirements for that cause of action.

Moreover, the sales of the ACMs occurred between 1946 and 1972. There is no allegation that a conspiracy existed after that time or that it still exists such that plaintiffs were denied the ability to obtain sufficient facts to plead the cause of action. Indeed, such a claim would be highly unlikely. As acknowledged in the complaints, the Environmental Protection Agency (EPA) banned the application of friable ACMs in 1978. In 1979, the EPA issued to all school districts "Asbestos-Containing Materials in School Buildings: A Guidance Document" and "Asbestos-Containing Materials in Schools: Guidance for Asbestos Analytical Programs," which dis-

cussed the hazards of asbestos. Included in the plaintiffs' appendix are the EPA rules and regulations on the subject which were issued in 1982 following an extensive fact-finding and rulemaking process. Furthermore, in 1983 a Federal class action was filed against many of these defendants on behalf of elementary and secondary schools, including the plaintiffs. (*In re School Asbestos Litigation* (3d Cir. 1986), 789 F.2d 996.) If there were any conspiracy it certainly has been exposed in the last decade.

This count, along with certain of the original 13, was included in the complaint with little factual basis, apparently in hopes that the circuit court would find some reason to allow the plaintiffs to proceed to trial. However, on these sparse pleadings we do not find it appropriate to proceed on the fraud action. Because of this holding we find it unnecessary to rule on the other bases of the dismissal, namely, whether the defendant's silence was sufficient to establish intent to deceive and whether the plaintiffs alleged damages recoverable in a fraud action.

## BREACH OF WARRANTY

In addition to the tort claims, the plaintiffs assert claims for breach of express and implied warranties. They contend that warranties were made through advertising, marketing and labeling that the ACMs were safe; the warranties were breached because the ACMs were unfit and unsafe for the ordinary and foreseeable uses of fireproofing, insulation and decorative purposes; and plaintiffs reasonably relied on defendants' representations that the products would not cause property damage and endanger the occupants' health.

The plaintiffs have not alleged the terms of any express warranties, nor do they attach any advertising, label or other document which sets forth their terms. To state a claim, the terms of the express warranty must be

stated or attached to the complaint (see, *e.g., Moorman,* 91 Ill. 2d at 92; see also *Nelligan v. Tom Chaney Motors, Inc.* (1985), 133 Ill. App. 3d 798, 802-03), and failure to do so renders the claim invalid.

The plaintiffs also seek recovery against all defendants based upon breach of implied warranties. Generally, under the contract principles of the Uniform Commercial Code, in order to state a claim against the defendant for breach of implied warranty, privity must exist between the plaintiff and defendant. (See generally *Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 301-11; 3 R. Anderson, Uniform Commercial Code §§2—314:92 through 2—314:98 (1983).) Plaintiffs contend that Illinois recognizes an exception to the privity doctrine whenever physical harm is alleged. Illinois has recognized an exception, but it is not as broad as plaintiffs argue. Privity is not required "when a buyer who has sustained personal injury predicates recovery against a remote manufacturer on the theory of implied warranty." (*Szajna,* 115 Ill. 2d at 301; *Berry v. G.D. Searle & Co.* (1974), 56 Ill. 2d 548, 558.) However, these complaints allege that there has been property damage, and we will not extend the personal injury exception in this contract action to allegations of property damage. (See Ill. Rev. Stat. 1985, ch. 26, par. 2—318 (adopting alternative A of UCC §2—318); 1 J. White & R. Summers, Uniform Commercial Code §11—4, at 535 (3d ed. 1988) ("Alternatives A and B of Code Section 2—318, however, retain the distinction between personal injury and property damage and remove the privity bar only when the plaintiff is 'injured in person' "); 3 R. Anderson, Uniform Commercial Code §2—314:92, at 200 (1983) ("courts are more willing to ignore the absence of privity when the plaintiff seeks recovery for personal injuries and for direct economic loss. In contrast, courts will be less likely to remove the obstacle of lack of privity when consequential economic

loss or property damage is involved"); see also *Szajna*, 115 Ill. 2d at 204 (discussing the public policy reasoning which supports abolition of the privity requirement in certain instances).) Therefore, these plaintiffs only state a cause of action against the defendants with whom they can establish privity of contract.

The defendants argue that the claim must fail even against those with whom there is privity because notice was not given of the breach and the complaints do not allege that notice was provided as required under the Uniform Commercial Code. Some form of notice that the transaction is troublesome is a prerequisite to recovery. (Ill. Rev. Stat. 1985, ch. 26, par. 2—607(3)(a) (buyer must within a reasonable time of discovering a breach notify the seller "or be barred from any remedy"); *Berry v. G.D. Searle & Co.* (1974), 56 Ill. 2d 548, 555-56.) Failure to satisfy this requirement is fatal to the cause of action.

The plaintiffs concede that they have not alleged that notice was provided. They argue that this is not fatal because sufficient notice is provided by the filing of a lawsuit. In addition to the filing of the present suit, they contend that notice has been provided by the filing in 1983 of a Federal class action "on behalf of all United States elementary and secondary schools (including all plaintiffs) against virtually all the defendants here." There is some support for the proposition that filing of the lawsuit is sufficient notice. (*Goldstein v. G.D. Searle & Co.* (1978), 62 Ill. App. 3d 344, 349-50 (consumer sued manufacturer of a birth control pill to recover personal injuries); *Shooshanian v. Wagner* (Alaska 1983), 672 P.2d 455, 462 ("The majority of courts do not allow the filing of a complaint to serve as notice. We disagree, and are of the opinion that a complaint filed by a retail consumer within a reasonable period after goods are accepted satisfies the statutory notice requirement").) We believe that in this instance, when no personal injuries have

been alleged and the plaintiffs are a body politic and not typical consumers, filing of a lawsuit is insufficient to satisfy section 2—607(3)(a). See 4 R. Anderson, Uniform Commercial Code §2—607:38, at 142-43 (1983) (commencement of a lawsuit should not be held to satisfy the notice requirement; however, it may be sufficient when a consumer sues for personal injuries).

The appellate court held that whether there was adequate notice is a question of fact. As a general principle that is true, but we are dealing with whether there has even been an allegation that notice was given and a question of law as to whether the filing of a lawsuit in this instance is sufficient to meet the notice requirements. We believe that these questions may properly be resolved in a motion to dismiss · and affirm the trial court's rulings. Further, we conclude that the allegations of the complaint are just too general, vague and indefinite to state a cause of action based on breach of express or implied warranty.

## RESTITUTION

The plaintiffs' next cause of action is based on section 115 of the Restatement of Restitution. (Restatement of Restitution §115 (1937).) They contend that the defendants must reimburse them for expenditures they will incur to inspect, maintain, repair or remove the ACMs in their buildings. The premise of the claim is that the defendants have a duty to perform these measures and if the plaintiffs discharge this duty they will confer a benefit upon the defendants for which they should be compensated. The circuit court ruled that the defendants did not have a duty and that section 106 of the Restatement bars contribution. Section 106 provides that one "who, incidentally to the performance of his own duty or to the protection or improvement of his own things, has conferred a benefit upon another, is not thereby entitled to

contribution." (Restatement of Restitution §106 (1937); see *Griffith Wrecking Co. v. Greminger* (1978), 65 Ill. App. 3d 962, 964.) The appellate court held that because of the hazardous nature of the asbestos a duty upon the defendant exists to remove it or to reimburse the plaintiffs for their efforts.

Section 115 provides:

"Performance of Another's Duty to the Public.

A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if

(a) he acted unofficiously and with intent to charge therefore, and

(b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety." (Restatement of Restitution §115 (1937).)

The plaintiffs argue that the defendants have created a public hazard and if the plaintiffs take the corrective action they must be reimbursed. To support this position they rely on a number of cases which found that a duty existed and allowed a restitution cause of action. In *Wyandotte Transportation Co. v. United States* (1967), 389 U.S. 191, 19 L. Ed. 2d 407, 88 S. Ct. 379, a barge sank in the Mississippi River. The Federal government located and raised the sunken craft to avoid a substantial danger posed by the ship's cargo of chlorine being at the bottom of the river. The government was allowed to recover the more than $3 million of expenses it incurred. However, in *Wyandotte*, the owner of the barge had an express statutory duty pursuant to section 409 of the Rivers and Harbors Act of 1899 to remove a sunken craft from navigable waterways. (33 U.S.C. §409 (1982).) In each of the other cases the plaintiffs rely upon, there was also an explicit statutory duty which the defendant

violated. See *United States v. P/B STCO 213, ON 527 979* (5th Cir. 1985), 756 F.2d 364 (the Federal Water Pollution Control Act placed primary duty on the defendants to clean up waters polluted by discharge of oil or hazardous substances and the government could recover the costs it incurred in the cleanup); *United States v. Healy Tibbitts Construction Co.* (N.D. Cal. 1985), 607 F. Supp. 540 (Federal Water Pollution Control Act imposed a duty upon the defendant); *State v. Schenectady Chemicals, Inc.* (1984), 103 A.D.2d 33, 479 N.Y.S.2d 1010 (State law imposed a duty upon polluters to abate the pollution).

Of the cases the defendants included in their appendix, one addressed the issue of whether there was a duty to remove asbestos from the plaintiff's property, and it denied the cause of action. The plaintiffs also included in their appendix six cases addressing this, and only two did not dismiss the cause. Both of these cases were South Carolina circuit court opinions, and in one the court ruled that since the issue of whether there was such a cause of action was unsettled in the State, the South Carolina Supreme Court would direct that it not be dismissed at the trial level.

We do not find these two cases persuasive and hold that the proper interpretation of section 115 is that the defendant must have a duty in the first instance and such a duty does not exist with the defendants before us. (*Town of Hooksett School District v. W.R. Grace & Co.* (D.N.H. 1984), 617 F. Supp. 126, 134 (holding the defendant asbestos company did not have a duty to remove the ACMs from the plaintiff's school buildings); *contra Adams-Arapahoe School District, No. 20—J v. Celotex Corp.* (D. Colo. 1986), 637 F. Supp. 1207, 1209 (held defendant had a duty to abate a hazard, though recognizing that Colorado had not addressed the emergency assistance doctrine); *City of New York v. Keene*

*Corp.* (1986), 132 Misc. 2d 745, 505 N.Y.S.2d 782, *order affirmed* (1987), 129 A.D.2d 1019, 513 N.Y.S.2d 1004 (school asbestos case wherein the cause of action survived the motion to dismiss; however, the requisite "duty" was based on the viability of the other causes of action).) A section 115 cause of action does not result merely because the defendants' product may be hazardous or damage the plaintiffs' buildings. Nor does the fact that there may be a contract or tort action automatically invoke section 115. There must be an independent basis which establishes a duty upon the defendant to act and the defendant must have failed to abide by that duty. To hold otherwise would create a restitution action any time there is a products liability claim. In this instance there exists no duty to inspect, repair or replace the product after it has been installed in the plaintiffs' buildings. The plaintiffs suggest that the Abatement Act is the source of a duty on the defendants to repair or replace the ACMs. However, the Act does not impose such a duty; in fact, the only parties directed to inspect, repair, replace or maintain according to the Act are the plaintiff school boards.

The facts of these cases do not fit comfortably within our general concept of restitution. The Restatement speaks in terms of a person having been unjustly enriched, or a benefit having been conferred on another, or a person having performed the duty of another. (Restatement of Restitution §§1, 13, 14, 15 (1937).) From the allegations of the complaints, it does not appear that the plaintiffs have abated the alleged hazards of asbestos, but are seeking to impose the cost of doing so on the defendants prior to their taking any action. However, because of our resolution of the restitution issue on the basis of duty, we need not resolve our concern with whether the cause is ripe. Therefore, we conclude that

the trial court was proper in dismissing the restitution count.

## · CONSUMER FRAUD ACT

The plaintiffs next assert a claim based on the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*) (Consumer Fraud Act). The trial court dismissed the claim, ruling that the plaintiffs lacked standing under the Consumer Fraud Act to sue, that the plaintiffs had not alleged a consumer injury and that the 1973 amendment to the Act allowing a private cause of action could not be applied retroactively to grant a cause of action based on sales that occurred between 1946 and 1972. The appellate court reversed, holding that the Consumer Fraud Act conferred standing on school districts as "persons" and "corporations." (Ill. Rev. Stat. 1985, ch. 121½, par. 261(c).) The court did not address the remaining two reasons for the dismissal.

The definition section of the Consumer Fraud Act includes as those who are entitled to bring a claim under the statute:

"any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." (Ill. Rev. Stat. 1985, ch. 121½, par. 261(c).)

The plaintiffs argue that they are "persons" and cite to the rule of statutory construction promulgated in the general provisions section of our statutes that " '[p]erson or 'persons' as well as all words referring to or importing persons, may extend and be applied to bodies politic and corporate as well as individuals." (Ill. Rev. Stat. 1985, ch. 1, par. 1006.) However, in enacting the Consumer Fraud Act the legislature expressly limited its ap-

plication to "any *natural* person" and not to the broader "person." (See *Lake Shore Auto Parts Co. v. Korzen* (1973), 54 Ill. 2d 237, 239 (*on remand from Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001 (distinguishing corporations and natural persons)), *overruled on other grounds, Hanley v. Kusper* (1975), 61 Ill. 2d 452.) The plaintiffs do not argue that a school district is a "natural person" and to accept their interpretation would make superfluous the word "natural" and ignore a legislative directive as to whom the Consumer Fraud Act applies to.

The plaintiffs also argue that pursuant to the School Code school districts have the legal status of bodies "politic and corporate," with capacity to sue and be sued (Ill. Rev. Stat. 1985, ch. 122, par. 10—2), and thus fall within the Consumer Fraud Act definition of a "corporation." The Consumer Fraud Act clearly makes an unusual distinction that the Act only applies to domestic and foreign corporations. A body politic or municipal entity is neither type of corporation, and we believe that such an interpretation would again ignore language within the Act.

It is appropriate statutory construction to consider similar enactments when interpreting for the first time statutory language. (*Anderson v. City of Park Ridge* (1947), 396 Ill. 235, 244 ("It is proper not only to compare statutes relating to the same subject matter but to consider statutes upon related subjects though not strictly *in pari materia*"); 2A N. Singer, Sutherland on Statutory Construction §53.03, at 554 (Sands 4th ed. 1984) ("On the basis of analogy the interpretation of a doubtful statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships").) Our conclusion that the terms "person" or "corporation" found within the Consumer Fraud Act do not include a

body politic is supported by the practice of the legislature, when it means to include governmental bodies within such a definition, of clearly stating so in the act. Provisions of the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 311 *et seq.*) are expressly incorporated into the Consumer Fraud Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262) and the scope and purposes of the two acts are similar. In the definitions section of the Uniform Deceptive Trade Practices Act, "person" is defined as "an individual, corporation, government or governmental subdivision \*\*\*." (Ill. Rev. Stat. 1985, ch. 121½, par. 311(5).) In the comments to this section, it states that the definition is substantially the same as that found in the Uniform Commercial Code. (Ill. Ann. Stat., ch. 121½, par. 311(5), Illinois Notes, at 247 (Smith-Hurd Supp. 1989).) Similarly, the definition of person in the Commercial Code expressly includes an individual, corporation, *government or governmental subdivision.* (Ill. Rev. Stat. 1987, ch. 26, pars. §1—201(28), (30); see also Ill. Rev. Stat. 1987, ch. 111½, par. 1003.26 (Environmental Protection Act); Ill. Rev. Stat. 1987, ch. 95½, par. 700—3 (Illinois Hazardous Materials Transportation Act); Wash. Rev. Code §19.86.090 (1971) (Washington Consumer Protection Act: " 'person' shall include the counties, municipalities, and all political subdivisions of this state"), quoted in *Johnston v. Beneficial Management Corp. of America* (1975), 85 Wash. 2d 637, 641 n.1, 538 P.2d 510, 514 n.1.) Thus, the legislature is aware of how to include a body politic within the definition of "person" or "corporation," and we believe that its failure to do so in the Consumer Fraud Act shows an intent not to include them within the definition of persons who may sue based on the Act. In light of this holding, it is unnecessary to rule on the retroactive effect of the statute or whether a consumer injury was involved.

## ASBESTOS ABATEMENT ACT

The plaintiffs cross-appeal from the dismissal in the trial court, and its affirmance in the appellate court, of an implied cause of action under the Illinois Asbestos Abatement Act (Ill. Rev. Stat. 1985, ch. 122, par. 1401 *et seq.*). Both parties rely on *Sawyer Realty Group, Inc. v. Jarvis Corp.* (1982), 89 Ill. 2d 379, in delineating the factors to examine when determining whether a statute creates an implied private remedy, though they disagree on the exact criteria established. *Sawyer* clearly set forth four factors to consider: (1) whether the plaintiff is within the class of persons the statute was designed to protect, (2) whether implying the cause of action is consistent with the underlying purpose of the act, (3) whether the plaintiff's injury is one the statute was designed to prevent, and (4) whether implying a cause of action is necessary to effectuate the purposes of the act.

However, *Sawyer* did not establish a rigid formula, and indeed other factors have been found relevant. Courts have inquired whether the statute imposes a duty of behavior on the defendant (*Sawyer*, 89 Ill. 2d at 384 (real estate brokers must follow the regulations created by the Department of Registration and Education); *Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, 153-54 (the Election Code mandated that employers could not deduct wages from employees who took time off to vote); *Witt v. Forest Hospital, Inc.* (1983), 115 Ill. App. 3d 481, 484 (the Guardianship and Advocacy Act prohibited employers from discharging employees who provided information to the Guardianship and Advocacy Commission), whether the Act is restrictive as to the available remedies (*Sawyer*, 89 Ill. 2d at 389-91; *Teale v. Sears, Roebuck & Co.* (1976), 66 Ill. 2d 1, 5; *Corgan v. Muehling* (1988), 167 Ill. App. 3d 1093, 1104), or whether the violation of the Act contravenes

public policy (*Peel v. Yellow Cab Co.* (1986), 147 Ill. App. 3d 992, 994)).

We find it unnecessary to perform a detailed analysis of the application of these factors as they relate to the Asbestos Abatement Act and these parties. *Sawyer* was clear that we will "imply a private remedy where there exists a *clear need* to effectuate the purpose of an act." (Emphasis added.) (89 Ill. 2d at 389.) In this case there does not exist a clear need. We have already recognized that the complaint alleges sufficient facts for a cause of action in strict liability, negligence and negligent misrepresentation. The plaintiffs also might have stated causes of action in fraudulent misrepresentation, and breach of express and implied warranties, if the pleadings had been more specific or had the plaintiffs followed the necessary statutory prerequisites. Furthermore, the fact that this statute imposes no duty on the defendants, rather it requires the plaintiffs to abide by a particular course of action, also supports our conclusion that the requirements for an implied private right of action are not found in the Asbestos Abatement Act.

Plaintiffs ask us to find that the legislature expressed an intent to create a private remedy in the legislative declaration section of the Act and through passage of the funding provision. The purpose expressed in the declaration is to provide financial assistance to schools for identification, containment or removal of dangerous asbestos. (Ill. Rev. Stat. 1985, ch. 122, par. 1402.) Section 9 of the Act states that the sources of funding will be the General Revenue Fund, the Federal Asbestos School Hazard Abatement Act of 1984 and proceeds from litigation. (Ill. Rev. Stat. 1985, ch. 122, par. 1409.) We fail to see how this shows an intend to create a private remedy based on the Act. First, the funding provision was enacted after these suits were filed. Second, it merely shows that the legislature recognized that there may be

a valid common law or statutory cause of action by the school districts against the manufacturers, distributors and contractors of asbestos and that the money recouped should help pay for the duties imposed on the school districts. Therefore, we conclude that this cause of action was properly dismissed.

## STATUTE OF LIMITATIONS

The trial court held that the statute of limitations barred all claims. Based on *City of Shelbyville v. Shelbyville Restorium, Inc.* (1983), 96 Ill. 2d 457, the appellate court reversed, reasoning that the school districts were asserting a public right and were therefore immune from the various limitations periods. We have narrowed the viable causes of action to three and will limit our scope of review to the school districts' immunity to the statutes of limitations for the strict liability, negligence, and negligent misrepresentation counts.

In *Shelbyville*, we recognized that the doctrine of sovereign immunity is supported by the policy judgment that the public should not suffer as a result of the negligence of its officers and agents in failing to promptly assert causes of action which belong to the public. (96 Ill. 2d at 461.) In accord with this principle, we must determine whether the right which the government unit seeks to assert is in fact a right belonging to the general public, or whether it belongs only to the government or some small distinct subsection of the public at large. (96 Ill. 2d at 462.) The city in *Shelbyville* sued to recover money it had spent to complete construction of streets which a subdivision builder failed to construct. We concluded that the city's interest in bringing the lawsuit was sufficiently "public," reasoning:

"It is apparent that the safety of all persons who have occasion to use the streets at issue here will depend on the workmanlike construction and maintenance of these

streets. Insofar as it is the continuing responsibility of cities to ensure such construction and maintenance for the use of the public (Ill. Rev. Stat. 1969, ch. 24, par. 9—1—1 *et seq.*), the inability of the city of Shelbyville to enforce its annexation agreement or compel payment by the defendant will affect the city's finances and may impair its ability to build or oversee the construction or maintenance of streets within its jurisdiction in the future." 96 Ill. 2d at 464.

Defendants contend that common law immunity does not apply, arguing that the school districts' interests do not affect the public at large because all the people of the State alike do not use the buildings and that the "only parties to benefit from the plaintiffs' actions are the respective school districts." Furthermore, they contend that the school districts are not suing on behalf of the public but are acting the same as any other property owner who must comply with a governmental regulation.

We believe that the defendants misconceive the nature of this action and conclude that the school districts' interests in pursuing these common law remedies against the various defendants to recoup costs of repairing or replacing the ACMs are sufficiently "public." The defendants have profited from the sale of ACM. The complaints allege that as a result of the asbestos in these products, toxic fibers exist throughout the public school buildings in sufficient amounts, for the basis of a tort claim, to constitute property damage. Though property damage is alleged, for the purposes of this issue, we cannot ignore the resulting health concerns involved, and at trial the plaintiffs will have an opportunity to establish that the levels of asbestos in the buildings can cause personal injury. The complaint also alleges a costly program is underway to repair, replace and maintain the ACMs. This complaint has alleged, therefore, an interest in the safety of these public buildings and in the safety of a

large segment of this State's population which attends the public schools and for the children who will in the future attend these schools. There is also the interest of the parents, faculty, staff and other people who use or will use our public school system. Moreover, unlike "any other property owner," these buildings are owned by the government, maintained with tax revenue, and used for mandatory classroom attendance as well as for other public functions.

Contrary to the defendants' assertion, the governmental body need not be asserting an interest affecting everyone in the State in order for it to qualify as a public right. However, there must be sufficient interest in the general public. (See, *e.g., Shelbyville,* 96 Ill. 2d at 464 (construction of roads within the subdivision of a city); *People ex rel. City of Chicago v. Commercial Union Fire Insurance Co.* (1926), 322 Ill. 326, 332-33 (city sued to recover funds used to maintain its fire department; public rights involved because maintenance of a fire department was not for city's private benefit but for the safety, health and general welfare of the public); *Clare v. Bell* (1941), 378 Ill. 128, 131 (action to collect county property taxes held to be public because public revenues were involved).) The defendants' argument that a claim by a public school with respect to school property is not an assertion of a public right relies in part on *Brown v. Trustees of School* (1906), 224 Ill. 184. In *Brown* the school district sued to recover ownership of a piece of land which had been part of a school house lot. However, a private citizen adversely possessed the land for more than 20 years. The court concluded that acquiring the lot did not constitute a public right. The action before us concerns numerous school districts and buildings, rather than a single tract of land. The complaint also contains allegations of property damage which will be costly to repair. Moreover, there is a health concern

involved. We believe that the interest in this case is of sufficient general concern for the people of the State and that the school districts are acting to promote that concern.

There is support for our conclusion that a public right is involved within the Asbestos Abatement Act. Our State legislature has followed the lead of the Federal government in enacting legislation to abate asbestos in school buildings, and this litigation is an outgrowth of the Act. The Asbestos Abatement Act specifically states that "in view of the fact that the State of Illinois has compulsory attendance laws for children of school age and these children must be educated in a safe and healthy environment, the presence and condition of asbestos in the schools is of special concern to the General Assembly." (Ill. Rev. Stat. 1985, ch. 122, par. 1402(d).) Therefore, corrective action must be taken where ACMs constitute a significant health hazard to students, school personnel, parents and visitors to the schools. (Ill. Rev. Stat. 1985, ch. 122, par. 1402(d).) The Act is applicable to all school districts in the State. Though it imposes the duty to act on the individual school districts, they must do so in conjunction with the Department of Public Health and with oversight by the State's Asbestos Abatement Council. (Ill. Rev. Stat. 1985, ch. 122, pars. 1405 through 1408.) Further State involvement is found in the directive that school districts cooperate fully with the Attorney General in any litigation to recover costs of abatement (Ill. Rev. Stat. 1987, ch. 122, par. 1409c), and that reimbursement grants will be calculated by the State Board of Education and the Department of Public Health (Ill. Rev. Stat. 1987, ch. 122, par. 1409a).

The defendants also contend that in determining whether a governmental entity is pursuing a public interest, review should be made of the nature of the transaction and not the consequences flowing from the transac-

tion. The nature of this transaction is the sale of a product from a merchant to a school board. We believe that the focus of *Shelbyville* properly concentrated instead on the effects of the interest on the public, the governmental entities obligation to act on behalf of the public and the extent to which public funds must be expended. (96 Ill. 2d at 464-65.) Regarding the fiscal effect, defendants correctly point out that almost any time a governmental entity is involved there will be some fiscal impact. However, this prong of *Shelbyville* must be given a realistic application. We are not dealing here with small sums of money; rather, the cost of these abatement projects will run into the millions. This cost will be shouldered by the local school districts, appropriations from the State, Federal funds, or this litigation. In applying the criteria of *Shelbyville*, we conclude that the school districts are not barred by the statute of limitations.

The defendant next argues that regardless of any common law immunity the products liability statute of limitations clearly bars an untimely action by a governmental entity. In *Clare v. Brown* (1941), 378 Ill. 128, 130-31, we stated "that unless the terms of a Statute of Limitations expressly include the State, county, municipality or other governmental agencies, the statute, so far as public rights are concerned, as distinguished from private and local rights, is inapplicable to them." (See also *County of DuPage v. Graham, Anderson, Probst & White, Inc.* (1985), 109 Ill. 2d 143, 152-53; *In re Special Education of Walker* (1989), 131 Ill. 2d 300.) We have already held that in pursuing these causes of action the school boards are enforcing public rights. The defendants contend that the limitations provision for a products liability action (Ill. Rev. Stat. 1985, ch. 110, par. 13—213), on its face, is made applicable to governmental entities. Thus, defendants argue, regardless of whether

public rights are involved, the cause must have been filed within the statutory provision or it is barred.

Section 13—213 of the Code of Civil Procedure provides a statute of limitations which applies to actions based on the doctrine of strict liability in tort. "This definition excludes actions brought by State or federal regulatory agencies pursuant to statute." (Ill. Rev. Stat. 1985, ch. 110, par. 13—213(a)(3).) Defendants argue that this limited exception in the statute precludes all other exceptions. We do not agree with the defendants' conclusion that this definition, on its face, makes governmental entities subject to the limitations period. There is no express language including governmental entities in the statute, such as is found in other statutes. In fact, in the very next section of the limitations statute the legislature expressly included "any body politic." (Ill. Rev. Stat. 1987, ch. 110, par. 13—214 ("person," for purposes of the statute of limitations for a cause of action resulting from construction work, "means any individual, any business or legal entity, or any body politic"); see also Ill. Rev. Stat. 1987, ch. 24, par. 7—1—46 ("Neither the People of the State of Illinois nor any person, firm or corporation, public or private, nor any association of persons" may bring an annexation contest after the statute of limitations has run).) The fact that section 13—213 excepts regulatory agencies acting pursuant to statute cannot be construed to mean that all governmental bodies are *expressly included* within the limitations set forth in section 13—213 for products liability actions. In the absence of a more specific manifestation of legislative intent, we refuse to read the statute so as to remove the common law immunity of these governmental entities.

For the reasons stated, we affirm the appellate court's judgment, though not necessarily its reasoning, on the counts based on strict liability, negligence, and negligent misrepresentation. We also affirm the judg-

ment of the appellate court on the implied cause of action pursuant to the Asbestos Abatement Act, and its conclusion that the statute of limitations does not bar the viable causes of action. The appellate court is reversed on the counts based on fraudulent misrepresentation, breach of express and implied warranties, restitution and the Consumer Fraud Act. The cause is remanded to the circuit court of Cook County.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded.*

WARD and CLARK, JJ., took no part in the consideration or decision of this case.