**VACUUM INDUSTRIAL POLLUTION, INC., Plaintiff,**

v.

**UNION OIL COMPANY OF CALIFORNIA and National Union Fire Insurance Company of Pittsburgh, Defendants.**

No. 89 C 7304.

United States District Court, N.D. Illinois, E.D.

May 2, 1991.

W. Briscoe Swan, Jr., Houston, Tex., David Apter, Jill Doherty, Kantor & Apter, Ltd., Northbrook, Ill., Rozanne M. McKinney, McKinney & McKinney, Bellaire, Tex., for plaintiff.

James O. Nolan, Mary F. Stafford, Clausen Miller Gorman Caffrey & Witous, P.C., Kevin J. Narko, Mark A. Lies, II, Thomas H. Peckam, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Vacuum Industrial Pollution, Inc. ("VIP") brought this diversity action against Union Oil Company of California ("Union Oil") and National Union Fire Insurance Company of Pittsburgh ("National Union"), alleging breach of contract, negligence, and breach of duty of good faith. Union Oil and National Union have filed separate motions to dismiss for failure to state a claim upon which relief can be granted. For the reasons stated below, defendants' motions to dismiss are granted with prejudice.

## FACTS

The facts pleaded in VIP's amended complaint are taken as true for the purpose of defendants' motions to dismiss. On March 1, 1984, VIP and Union Oil entered into a written purchase order regarding the cleaning of a tank containing chemical catalyst at Union Oil's Romeoville, Illinois refinery. In July, 1984, an explosion at the refinery killed eighteen Union Oil workers. Union Oil retained VIP, a professional industrial cleaning company, to clean out part of the refinery affected by the explosion. Responding to VIP's concern about the possibility of catalyst remaining in the pipe above the tank, Union Oil replied that its personnel had inspected the pipe and found no catalyst there. Union Oil then issued a safe entry permit and posted it on the tank.

VIP asked that two exits be installed in the tank for the workers cleaning the interior, which would have required removing the pipe. Union Oil neglected to remove the pipe and provided only one exit from the tank. VIP also asked for adequate lighting equipment from Union Oil for cleaning the interior of the tank, but Union Oil failed to provide it. Despite VIP's concern about cleaning the tank in a safe manner, Union Oil personnel notified VIP supervisors that their work was proceeding too slowly. On September 27, 1984, VIP employees entered the tank and began removing the catalyst and other industrial by-products with industrial vacuum equipment. Shortly after they began, powdered catalyst fell from the pipe above the tank, fatally smothering two workers and injuring a third standing by the tank. Fifteen feet of VIP's suction hose were crushed and ruined in the accident.

After the accident, VIP employees and representatives spent a great deal of time on related investigations, insurance disputes, and lawsuits, which interfered significantly with VIP's ongoing business in the Chicago area. Moreover, because of its connection with the fatal accident at Union Oil, VIP suffered severe financial losses in its Chicago area business—even though it was not responsible for the conditions which resulted in the deaths of its workers.[1] As a result of being the contractor involved in the tragedy, VIP could no longer obtain similar work for several customers in the Chicago area whom it had served for years. Within a year and a half of the accident, VIP suffered lost profits in excess of $750,000, and had to close its Chicago office.

As a further result of the accident on September 27, 1984, VIP's insurance carrier, National Union, made renewal of VIP's insurance policy available only on payment of a $750,000 premium for $1,000,000 of coverage. VIP had paid a premium of $31,-000 for $500,000 of coverage before the accident. Unable to afford the new premium demanded by National Union, VIP had to purchase a claims-made policy with an unrated carrier for $100,000. Apart from the added expense of the new policy, VIP lost at least one major job because of inadequate insurance coverage, producing further serious economic damage to the company.

National Union also played a culpable role in VIP's difficulties, according to VIP. On March 1, 1984, VIP and National Union entered into a contract whereby National Union provided $500,000 of coverage for $31,542 paid in premiums by VIP. In its contract with Union Oil, VIP had agreed to be responsible for Union Oil's defense of any claims arising out of its performance under the contract. On October 4, 1984, Union Oil sent a letter to VIP's insurance agent, Frank B. Hall & Co., demanding insurance coverage for all liabilities arising from the accident of September 27, 1984. VIP forwarded the request to National Union.

National Union "apparently" failed to investigate whether insurance coverage should be provided to Union Oil, despite a provision in the purchase order between VIP and Union Oil which allowed for refusal of coverage upon Union Oil's sole negligence. Am.Complaint, ¶ 24. National Union also failed to ascertain a conflict of interest between VIP and Union Oil. National Union retained attorneys to represent Union Oil in one or more lawsuits filed by families of deceased VIP employees. These attorneys contacted VIP, falsely representing themselves as attorneys for VIP, and obtained confidential reports and information which they later used against VIP in at least one trial to obtain an inexpensive settlement.

National Union failed to offer VIP an opportunity to obtain independent counsel based on a conflict of interest between the two insureds. Instead, when apprised of the conflict, National Union retained Henry Gurion to represent VIP. Gurion, however, had a close relationship and had been

---

1. It bears repetition that these are the facts according to VIP, accepted as true only for the purpose of defendants' motions to dismiss.

formerly employed with Purcell & Wardrope, the firm selected by National Union to represent Union Oil. Gurion now works directly for National Union's adjustment company. Gurion failed to consult with VIP, and failed to appear at the trial where VIP witnesses were extensively questioned "in a hostile manner." Am.Complaint, ¶ 8.

By virtue of the foregoing, VIP alleges that Union Oil breached its contract with VIP, and also acted negligently. VIP further charges National Union with breach of contract, and with breach of duty of good faith.

## DISCUSSION

### I. *Union Oil Motion to Dismiss*

### A. Count I—Breach of Contract

Count I of the amended complaint charges Union Oil with breaching its purchase order contract with VIP in two respects. First, paragraph 2 of the purchase order provides that "[a]ll work is to be entirely under [VIP's] supervision, direction and control." Am.Complaint, Exh. A. "In fact", alleges Count I, "Union Oil supervisors did not allow VIP to supervise, direct, and control the work, instead insisting that it be performed faster than was safe under the circumstances, under poor lighting conditions, and without the two safety exits requested by VIP." Am.Complaint, ¶ 15.

Second, section VI.C of Exhibit A to the contract states that "[e]ntry into any tank ... is strictly prohibited without an Entry Permit issued by a Union Oil Company Safety Inspector ... Tests will be conducted by the Union Oil Company Safety Inspector to ensure the safety of the entry operation." Am.Complaint, ¶ 16. Union Oil "therefore had an affirmative duty to conduct tests to ensure that the pipe above the tank did not contain catalyst, but failed to conduct adequate tests to ascertain that

the pipe was full of catalyst that could cause a cave-in such as the one that occurred. Such a failure was a material breach of the contract in question between Union and VIP." Am.Complaint, ¶ 5.

VIP attributes the accident of September 27, 1984 to these contractual breaches by Union Oil. Also attributed to Union Oil are the series of events following the accident. They are, to repeat, the destruction of fifteen feet of VIP's suction hose; investigations, insurance disputes, and lawsuits that interfered with VIP's Chicago area business; severe financial losses stemming from VIP's association with the accident, leading ultimately to the closing of VIP's Chicago office; National Union's demand that VIP pay a $750,000 premium for renewing its $1,000,000 insurance policy, leaving VIP no option but to purchase expensive insurance with an unrated carrier; and, finally, the loss of at least one major job because of inadequate insurance coverage.

Union Oil moves to dismiss VIP's breach of contract claim on the grounds that the damages sought by VIP were not proximately caused by Union Oil's alleged breach, were not within Union Oil's contemplation at the time the contract was formed, and are too speculative and uncertain to be recoverable. Union Oil is correct in every respect. Even if this lawsuit were filed by VIP on behalf of its employees and their estates, seeking recovery for their injuries or deaths in the accident on September 27, 1984, there would be serious doubt as to whether VIP could satisfactorily allege a causal relationship between Union Oil's contractual breaches and the accident.[2]

But VIP is not suing for the deaths of its employees. It is seeking damages for injuries far more removed from

---

**2.** VIP continued working despite Union Oil's alleged refusal to allow VIP to supervise its own work. There is no indication that VIP confronted Union Oil before the accident about its behavior. It would therefore seem that VIP's failure to act played the causal role in the accident. Moreover, by continuing to work without objection, VIP implicated the following principle,

well-established in Illinois: "a party to a contract waives his right to relief from the breach thereof ... where the facts and circumstances establish an "'intentional relinquishment of a known right ... aris[ing] ... by conduct inconsistent with an intent to enforce the right.'" *Wikoff v. Vanderveld,* 897 F.2d 232, 241 (7th Cir.1990).

the accident: financial losses, the collapse of its business, the loss of future business, even the loss of favorable insurance policies. To recover in contract, as in tort, a plaintiff must show that his damages were proximately caused by the defendant's wrongful conduct. *See, e.g., Mercury Cleaning Sys., Inc. v. Manitowac Eng'r Corp.*, 255 F.2d 318 (7th Cir.1958). In no sense were VIP's far-flung injuries proximately caused by Union Oil's alleged breach of contract. Rather, they are precisely the kind of remote damages not recoverable under the century-old doctrine enunciated in *Hadley v. Baxendale*, 9 Ct. of Exch. 341 (1854):

damages for breach of contract are limited to those that "may reasonably be supposed to have been in the contemplation of the parties, at the time they made the contract, as the probable result of the breach of it."

*Bartinikas v. Clarklift of Chicago North, Inc.*, 508 F.Supp. 959, 962 (N.D.Ill.1981). The linchpin of this rule is foreseeability: "only foreseeable damages are recoverable in a contract action." *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 958 (7th Cir. 1982), *cert. den.* 459 U.S. 1017, 103 S.Ct. 377, 74 L.Ed.2d 511 (1982).

It could not have been foreseeable to Union Oil, at the time the contract was signed, that failing to give VIP full supervisory rights over its own work or to conduct adequate tests of catalyst content would lead to the collapse of VIP's Chicago area business. The losses claimed by VIP are especially unforeseeable since they stem from the refusal of third parties to do business with VIP. VIP insists that "the damages caused as a result of the Union Oil accident were what any person who uses industrial cleaning services would contemplate at the time of the making of the contract." Response, p. 9. But a long line of cases "make[s] clear that that kind of general foreseeability, which is present in virtually every case, does not justify an award of consequential damages." *Evra*, at 959.

 It is also well-established that recovery may not be had for purely specula-

tive damages. *See, e.g., Schoeneweis v. Herrin*, 110 Ill.App.3d 800, 66 Ill.Dec. 513, 443 N.E.2d 36 (5 Dist.1982); *Bartinikas, supra*, at 962 (lost profits recoverable "if proved with reasonable certainty."). VIP could not possibly calculate, with any reasonable certainty, the extent to which its lost profits derived from its "connection with the fatal accident at Union Oil." Am. Complaint, ¶ 13. Accepting as a "general proposition" Union Oil's observation that damages must be foreseeable and not speculative, VIP insists that "these are questions for the trier of fact and are not appropriate for a Rule 12(b) motion." Response, p. 7. But this is so only where the allegations of a complaint could support a genuine factual issue. Here there can be no doubt that VIP's alleged injuries were unforeseeable, its damages speculative. As a matter of law, Count I of the amended complaint fails to state a cause of action for breach of contract. Union Oil's motion to dismiss is therefore granted as to Count I.

## B. Count II—Negligence

Count II seeks recovery for the same damages identified in Count I, but sounds in tort rather than contract. Specifically, VIP contends that "Union Oil breached its duty of reasonable care to VIP and was negligent in failing to make an adequate effort to ascertain the extremely dangerous condition of the tank in question, in failing to conduct adequate testing to determine the safety of the tank, in failing to provide proper equipment for lighting as requested by VIP, and in pressuring VIP unreasonably to hurry and finish the work despite the unsafe conditions existing in the tank." Am.Complaint, ¶ 18. The complaint further alleges that "Union Oil made negligent misrepresentations to VIP that the tank had been inspected and was safe to enter." *Id.*, ¶ 19.

Union Oil moves to dismiss Count II on the ground that Illinois law bars recovery of purely economic losses in tort. The *Moorman* doctrine, based on the Illinois Supreme Court's holding in *Moorman Manufacturing Co. v. National Tank Co.*,

91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), recognizes two distinct functions served by the laws of tort and contract. The former protects people from unreasonable risk of injury to their person or property; the latter protects expectations of suitability and quality in the purchased product. *Moorman*, 91 Ill.2d at 81–83, 61 Ill.Dec. 746, 435 N.E.2d 443. Economic losses—that is, "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits"—are protected by contract law. *Ganton Technologies, Inc. v. Quadion Corp.*, 755 F.Supp. 203, 208 (N.D.Ill.1990).

Because contract law is uniquely suited to their recovery, economic losses alone, "without any claim of personal injury or damage to other property," cannot be recovered in a tort action. *Id. See also Board of Educ. v. A.C. and S., Inc.*, 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580, 587 (1989) (confirming "the necessity of physical damage to other property or personal injury" for recovery in tort). Although *Moorman* speaks in terms of product liability, the doctrine applies to services as well as products. *Oak State Products v. Ecolab*, 755 F.Supp. 235 (C.D.Ill.1991); *Quadion*, at 207 ("the Moorman doctrine can be applied to negligence claims in connection with products or services ...").

■ The only "damage to other property" alleged in the amended complaint is fifteen feet of crushed suction hose. Am. Complaint, ¶ 12. VIP joins this element of damages with the others—namely, "lost profits from the time of the accident to the present, lost profits due to losing jobs because of inadequate insurance, and an increase in insurance premiums"—and seeks recovery in the amount of $1.1 million (not including $1.1 million in exemplary damages). Am.Complaint ¶ 21. VIP does not specify the amount attributable to the crushed hose, but it could hardly be significant—especially since VIP omitted any mention of the hose in its initial complaint, filed before VIP's motion to dismiss on *Moorman* grounds. Economic loss actions cannot be brought "within the sphere of tort law through the use of some fictional

property damage." *Board of Education*, 137 Ill.Dec. at 643, 546 N.E.2d at 588. Even assuming the legitimacy of VIP's suction hose damage claim, Union Oil correctly observes that VIP's amended complaint "undermine[s] the *Moorman* doctrine by bootstrapping a claim for a trivial amount of property damage into a cause of action seeking in excess of one million dollars." Memo. in Support, p. 11. Fifteen feet of crushed suction hose do not alter the basic character of VIP's action, which is almost exclusively for lost profits—precisely the sort of economic damages not recoverable under *Moorman*.

■ In another effort to escape *Moorman*'s reach, VIP cites *Bi–Petro Refining Co. v. Hartness Painting, Inc.*, 120 Ill. App.3d 556, 76 Ill.Dec. 70, 458 N.E.2d 209 (4 Dist.1983), for the proposition that "*Moorman* [does] not prevent recovery of economic damages for negligence if the occurrence in question was sudden and violent." Response, p. 3. VIP reads the same principle into *Vaughn v. General Motors Corp.*, 102 Ill.2d 431, 80 Ill.Dec. 743, 466 N.E.2d 195 (1984). In both *Bi-Petro* and *Vaughn*, however, the plaintiffs sought damages for harm to property that flowed directly from the "violent occurrence."

In *Bi-Petro*, an oil tank violently ruptured. The plaintiff complained of damage caused to the tank itself, other tanks, and other property on the premises, in addition to the loss of rental income from the tank. *Bi–Petro*, 76 Ill.Dec. at 71, 458 N.E.2d at 210. In *Vaughn*, the brakes on plaintiff's truck locked, causing the truck to overturn and rendering it unusable and beyond repair. The plaintiff sought damages for the loss of the truck, cleanup of spilled fuel, brake repair, and fuel tank repair, in addition to expenses incurred in renting another truck and spending extra time at work. *Vaughn*, 80 Ill.Dec. at 743, 466 N.E.2d 195.

Unlike plaintiffs in *Bi–Petro* and *Vaughn*, VIP is seeking damages for economic losses far removed from the "sudden and violent occurrence" that killed VIP's employees. To say, as VIP does, that "the loss of VIP's employees' lives and the resulting financial losses from this event

would be of greater significance than a personal injury or mere property damage" is to confuse the nature of VIP's lawsuit. Response, p. 3. The simple fact is that VIP is not suing for personal injury or property damage resulting from the accident; VIP's employees and their estates have already sued Union Oil in a separate action. Rather, VIP is suing to recover profits lost as a result of its association with an accident in which the employees were killed. *Bi–Petro*'s exception to *Moorman*, premised on the tort-like nature of a violent occurrence, does not extend to claims as remote from the occurrence as VIP's.

■ Seeking another loophole in the *Moorman* doctrine, VIP fixes on language in *2314 Lincoln Park West Condominium Assn. v. Mann*, 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990). Following a discussion of cases allowing recovery of economic losses despite *Moorman*, the *Lincoln Park* court explained, "[t]he principle common to those decisions is that the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred." *Lincoln Park*, 144 Ill.Dec. at 233, 555 N.E.2d at 352. VIP argues that the Illinois Premises Liability Act "creates an express statutory duty on an owner or occupier of land to use reasonable care under the circumstances to invitees such as VIP. This clearly takes the instant case out of the *Moorman* doctrine and creates an independent duty under tort law …" Supp.Memo. p. 2.

In the cases discussed in *Lincoln Park*, the plaintiffs sought recovery for injuries flowing directly from tortious behavior specifically alleged in the complaint. In one case, the plaintiff sought damages for harm to his truck after its brakes failed; in another, the plaintiff alleged intentional interference with prospective economic advantage; in another, intentional interference with contract. *Lincoln Park*, 144 Ill. Dec. at 233, 555 N.E.2d at 352. These cases involved damages that arose directly from defendants' alleged breach of a duty in tort, complained of by plaintiffs, unrelated to the contract at issue. Here, by contrast, neither the original nor amended complaint contains any mention of the Illinois Premises Liability Act. VIP's claims derive from Union Oil's alleged failure to abide by the terms of its contract with VIP, and the economic damages VIP seeks are remote. *Moorman* therefore prohibits their recovery in tort.

■ VIP's amended complaint includes a claim for negligent misrepresentation. Am.Complaint ¶ 19. Citing *Board of Educ. v. A.C. and S., supra*, 137 Ill.Dec. at 646, 546 N.E.2d at 591, VIP argues that it has alleged all the required elements. They are, according to VIP, "a false statement of material fact, intention to induce the other party to act, action by the other party in reliance on the truth of the statement made, a duty owed by the defendant to plaintiff to communicate accurate information, negligence of the defendant, and damage to the Plaintiff resulting from the reliance." Response, p. 4.

When recovery is sought only for economic losses, however, Illinois law permits a claim for negligent misrepresentation only "when two elements are present: First, the defendant must be in the business of supplying information, and second, the defendant must provide the information for the guidance of others in their business relationships with third parties." *Gerdes v. John Hancock Mut. Life Ins. Co.*, 712 F.Supp. 692, 696 (N.D.Ill.1989). VIP does not allege that Union Oil meets this description, which it clearly does not. VIP cites *A.C. and S.* to suggest that these two elements need not be satisfied, but that case explicitly distinguished "those cases [in which] the plaintiffs suffered economic losses as a result of the defendant's alleged misrepresentation." In *A.C. and S.*, "the plaintiffs have alleged physical injury." *A.C. and S.*, 137 Ill.Dec. at 647, 546 N.E.2d at 592.

■ Finally, VIP argues that "[i]t is only if the Court finds that VIP's contract action is fully adequate in the circumstances that the *Moorman* doctrine could conceivably apply to the instant case." Response, p. 6. It is well-established, however, that the *Moorman* rule applies even in the absence of an alternative remedy in contract.

*Lincoln Park,* 144 Ill.Dec. at 231, 555 N.E.2d at 350; *Anderson Electric, Inc. v. Ledbetter Erection Corp.,* 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986). VIP's tort claim against Union Oil is barred by the *Moorman* doctrine. Because its contract claim also fails for the reasons stated above, Union Oil's motion to dismiss is granted.

## II. *National Union Motion to Dismiss*

Count III of the amended complaint charges National Union with breaching its duty of good faith by failing to investigate whether insurance coverage should have been provided to Union Oil; failing to ascertain a conflict of interest between VIP and Union Oil; retaining attorneys who obtained confidential reports and information which they later used against VIP; failing to offer VIP an opportunity to obtain independent counsel; and retaining counsel who had formerly been employed with the firm selected by National Union to represent Union Oil, and who failed to consult with VIP or to appear at the trial where VIP witnesses were extensively questioned "in a hostile manner." Am. Complaint, ¶ 29.

Count IV, which alleges breach of contract, adds to this list of wrongs National Union's failure "to pay all sums for which VIP became legally obligated to pay, particularly for an independent attorney of VIP's choice when a conflict of interest was finally admitted by National Union." Am.Complaint, ¶ 33. National Union "further breached its contract of insurance by failing to meet its duty of providing a defense to VIP in the lawsuits filed by the families of VIP's deceased workers ... sacrific[ing] the interests of VIP so it could obtain the cheapest settlement possible." Am.Complaint, ¶ 34.

Because of these alleged wrongs, VIP claims it "has had to pay at least $300,000 in extra premiums for insurance coverage from 1985 through 1988, and has lost at least one major contract for work in the amount of approximately $50,000 because of its inability to obtain rated insurance coverage." Am.Complaint, ¶ 31. National

Union moves to dismiss on the grounds that VIP has failed to allege any breach of duty or policy obligation owed by National Union, sought damages not proximately caused by National Union, and pleaded a cause of action that is preempted by the Illinois Insurance Code. The court need not reach the latter·contention, because the first two require dismissal of VIP's action.

■ The gist of VIP's complaint is not that National Union failed to settle a claim under its policy, or refused to defend VIP in an action brought against it. Rather, VIP argues that National Union permitted VIP to be "wrongfully blamed" in the course of a lawsuit brought by VIP's employees against Union Oil. It is well-settled in Illinois, however, that "two requirements ... must be satisfied before an insurer's duty to defend arises. First, the action must be brought against an insured. Second, the allegations must disclose the potential of policy coverage." *Murphy v. Peterson,* 129 Ill.App.3d 952, 85 Ill.Dec. 112, 116, 473 N.E.2d 480, 484 (1 Dist.1984); *see also MFA Mutual Insurance Co. v. Crowther, Inc.,* 120 Ill.App.3d·387, 390, 75 Ill.Dec. 903, 458 N.E.2d 71 (1 Dist.1983). Nothing in the law or VIP's policy requires National Union to defend VIP when VIP has not been sued.

■ VIP insists that National Union had an obligation to provide VIP with independent counsel once a conflict of interest became apparent. Again, however, no actual conflict materialized because VIP was never made a party to the lawsuit between VIP's employees and Union Oil. National Union identifies two critical features in every case cited by VIP to support its claim that National Union should have allowed VIP to choose independent counsel: the insured was sued, and a conflict existed between the insurer and the insured. *See, e.g., Murphy v. Urso,* 88 Ill.2d 444, 58 Ill.Dec. 828, 430 N.E.2d 1079 (1981); *Nandorf, Inc. v. CNA Ins. Cos.,* 134 Ill.App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988 (1985); *Pekin Ins. Co. v. Home Insurance Company,* 134 Ill.App.3d 31, 89 Ill.Dec. 72, 479 N.E.2d 1078 (1985); *Pepper Construction Co. v. Casualty Insurance Co.,* 145 Ill.

App.3d 516, 99 Ill.Dec. 448, 449, 495 N.E.2d 1183, 1184 (1986); *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976).

National Union offers an apt description of VIP's argument: that an insured should be permitted "to trigger the insurer's defense obligation when the insured merely fe[els] threatened by the possibility of litigation." Reply, p. 4. That is not the law. Neither is it the law, as VIP asserts, that National Union has waived the right to contest its duty to defend VIP by failing to seek a declaratory judgment action or to provide a defense under a reservation of right. Response, p. 3. National Union could not possibly have sought a declaratory judgment action or provided a defense when no live controversy involving VIP existed. A party cannot waive the right to contest a duty it never had. *See, e.g., Eichelkraut and Sons, Inc. v. Bituminous Cas. Corp.*, 166 Ill.App.3d 550, 117 Ill.Dec. 13, 15, 519 N.E.2d 1180, 1182 (1988) (absent duty to defend, there can be no estoppel).

VIP is seeking to hold National Union liable for failing to protect its image in a lawsuit filed against Union Oil in which VIP was neither sued nor impleaded. There is no such cause of action. Even if it were actionable, there is no conceivable connection between National Union's alleged "sacrifice" of VIP's reputation and the extra premiums later demanded by National Union. VIP describes the causal link as follows:

> National Union's failure to provide [VIP] with independent counsel contributed to it being made the scapegoat for the fatal accident in question, although even initial investigation showed that Union Oil bore much greater responsibility. Being made the scapegoat for the accident resulted in VIP's liability coverage effectively being cancelled by National Union, despite an otherwise excellent risk history, and an inability to obtain rated coverage at any price, which resulted in at least the loss of one major contract.

Response, pp. 7–8.

VIP fails to explain why National Union could not renew VIP's insurance policy at any premium of its choosing. There is simply no need for National Union to conspire against VIP in a lawsuit not involving VIP, in order to justify higher premiums in the future. VIP's allegations fail, as a matter of law, to show proximate causation between National Union's alleged wrongs (which are themselves not actionable as a matter of law) and VIP's injuries. National Union's motion to dismiss Counts III and IV of the amended complaint is granted. Union Oil's motion also having been granted, this action is hereby dismissed with prejudice.