2016 IL App (4th) 140918
NO. 4-14-0918

FILED
June 20, 2016
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JOSEPH SONDAG and PHYLLIS SONDAG, | ) | Appeal from |
| Plaintiffs-Appellees, | ) | Circuit Court of |
| v. | ) | McLean County |
| PNEUMO ABEX CORPORATION; PNEUMO | ) | No. 08L17 |
| ABEX, L.L.C; METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY; OWENS-ILLINOIS, INC.; | ) | |
| HONEYWELL INTERNATIONAL, INC.; | ) | |
| SPRINKMANN SONS CORPORATION OF | ) | |
| ILLINOIS; SPRINKMANN SONS CORPORATION; | ) | |
| RAPID-AMERICAN CORPORATION; UNION | ) | |
| CARBIDE CORPORATION; GEORGIA-PACIFIC | ) | |
| CORPORATION; TREMCO, INC.; BONDEX | ) | |
| INTERNATIONAL; and JOHN CRANE, INC., | ) | |
| Defendants | ) | Honorable |
| (Tremco, Inc., Defendant-Appellant). | ) | Rebecca Simmons Foley, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justice Holder White concurred in the judgment and opinion.
Justice Harris specially concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1        Plaintiffs, Joseph Sondag and his spouse, Phyllis Sondag, sued defendant,

Tremco, Inc., claiming that asbestos-containing tape manufactured by defendant and used by

Joseph Sondag in his profession as a plasterer had caused him to develop pleural plaques and

interstitial fibrosis.  The jury returned a verdict in plaintiffs' favor, awarding them damages.

Defendant appeals.  We reverse the trial court's judgment.  The court should have granted

defendant's motion for a directed verdict, considering that, insomuch as the evidence before the

jury showed, Joseph Sondag is asymptomatic and thus has suffered no "physical harm." Restatement (Second) of Torts §§ 388, 402A(1) (1965).

¶ 2                                    I. BACKGROUND

¶ 3                         A. The Allegations Against Defendant

¶ 4              Two of the counts of the complaint were directed against defendant.

¶ 5              In count III, Joseph Sondag alleged as follows.  Defendant manufactured and sold asbestos-containing products, which were used at locations where he worked as a plasterer from the 1950s to the 1980s.  He was exposed to asbestos dust from these products and consequently developed asbestosis.  Before manufacturing and selling these products, defendant knew that exposure to asbestos dust caused "pulmonary fibrosis and malignancies."  Defendant "was negligent" by failing to warn of the adverse health effects of asbestosis and by failing to provide instructions on how to safely handle asbestos-containing products, if indeed there was any safe method of doing so.

¶ 6              In count IV, Phyllis Sondag repeated the foregoing allegations of count III and alleged that because of the negligently caused "injury to her husband," she had "suffered an injury to her husband/wife relationship and [had] become obligated for the expense of medical care received by her husband."

¶ 7                          B. Evidence in the Jury Trial

¶ 8                              1. *Joseph Sondag*

¶ 9              In the February 2014 jury trial, Joseph Sondag testified he was 82 years old and that from 1957 to 1983 he worked as a plasterer.  On virtually every job, he used drywall tape bearing the label of "Tremco."  Using a knife, he cut the tape to the needed lengths.

¶ 10                              2. *Michael Koehler*

¶ 11        Defendant's corporate representative, Michael Koehler, testified it was not until the late 1970s that a "few" of defendant's tapes became asbestos-free.  Counsel for plaintiffs impeached him with his deposition testimony, in which he stated that, as far as he knew, *all* of defendant's tapes contained asbestos during the years defendant used asbestos in its tapes.

¶ 12                                    3. *Al Rossi*

¶ 13        Al Rossi testified he had been Joseph Sondag's treating physician for more than 20 years and that before 2007 the patient's general health had been good, although he suffered from high blood pressure, controlled by medicine.

¶ 14        In 2007, Joseph Sondag came to him complaining of dizziness, sweating, and a disturbance of the inner ear.  Rossi had him undergo a chest X-ray as well as a computerized tomography (CT) scan of his chest, and these revealed pleural plaques and interstitial fibrosis (scarring) in his lungs.  Rossi diagnosed asbestosis, a permanent condition, which had been caused, he believed, by defendant's asbestos-containing tape.

¶ 15        Joseph Sondag never complained to him, though, of shortness of breath or chest pain.  His lungs were clear, with no wheezing or restriction.  Nevertheless, given the results of the X-ray and the CT scan, he had Joseph Sondag undergo a pulmonary function test, which measured breathing capacity and the ability to exchange carbon dioxide for oxygen.  The pulmonary function test showed a diffusion capacity of 54%:  in Rossi's opinion, an "excellent diffusion capacity" for a man of Joseph Sondag's age who had smoked.  The diffusing capacities, arterial blood gases, and total lung volumes all were within normal limits.

¶ 16        Afterward, follow-up examinations showed Joseph Sondag's condition to be unchanged.  As of the date of the trial, he still had no restrictive lung disease; he still had no pulmonary symptoms, no respiratory distress or limitation.  The pleural plaques were stable, and

Rossi had seen no progression in the last several years. In fact, he noted that, at age 82, Joseph Sondag could climb two flights of stairs, at a running pace, without shortness of breath. He agreed that Joseph Sondag was doing pretty well.

¶ 17                                4. *Julie Grant and Phyllis Sondag*

¶ 18        Joseph Sondag's daughter, Julie Grant, testified that complaining went against her father's nature and that he always would insist he was "fine." Nevertheless, she "definitely [had] noticed that he [was] short of breath."

¶ 19        Likewise, Joseph Sondag's spouse, Phyllis Sondag, who had known him for more than 65 years, had noticed he suffered from shortness of breath, which had "definitely gotten worse" over the past year and a half.

¶ 20                                II. ANALYSIS

¶ 21        Defendant cites several out-of-state cases in support of its argument that physical changes to the lungs resulting from the inhalation of asbestos dust, unaccompanied by any clinical symptoms, do not afford a cause of action for products liability. *Giffear v. Johns-Mansville Corp.*, 632 A.2d 880, 885 (Pa. Super. Ct. 1993); *Caterinicchio v. Pittsburgh Corning Corp.*, 605 A.2d 1092, 1096 (N.J. 1992); *Wright v. Eagle-Picher Industries, Inc.*, 565 A.2d 377, 381 (Md. Ct. Spec. App. 1989); *Burns v. Jaquays Mining Corp.*, 752 P.2d 28, 31 (Ariz. Ct. App. 1987); *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985); *In re Hawaii Federal Asbestos Cases*, 734 F. Supp. 1563, 1567 (D. Haw. 1990).

¶ 22        In one of those cases, a naval pipefitter, William Giffear, and his spouse, Paula Giffear, sought damages for physical injuries and for fear and increased risk of cancer arising out of his occupational exposure to asbestos. *Giffear*, 632 A.2d at 882. He pleaded "several theories of liability," all of which "allow[ed] recovery for *physical harm* to the user or consumer under

certain conditions." (Emphasis added.) *Id.* at 885 n.7. The problem was that all he had was "pleural thickening, absent disabling consequences or manifest physical symptoms." *Id.* at 884. The Superior Court of Pennsylvania held this was "a non-compensable injury and [was] therefore not a cognizable claim in the Commonwealth." *Id.* In explaining how it arrived at that holding, the court pointed out the distinction between an " 'injury' " and " 'harm,' " as those terms were defined by section 7 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 7 (1965)); this distinction was "important in understanding the Giffears' failure to show compensable harm suffered by Mr. Giffear." *Giffear*, 632A.2d at 885 n.7 (quoting Restatement (Second) of Torts § 7(1), (2) (1965)). Although William Giffear's lungs might have been " 'injured' " in the sense that the pleural thickening represented an invasion of his legally protected interest in bodily integrity, he had suffered no " 'harm' " in the sense of any "detrimental effects as a result of his asbestos exposure." *Id.* All his theories of liability required not "injury" but "physical harm." *Id.*

¶ 23        "Physical harm" is an essential element of any action for products liability (*Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 443 (1989); *Woodill v. Parke Davis & Co.*, 58 Ill. App. 3d 349, 355 (1978)), regardless of whether the action sounds in negligence (Restatement (Second) of Torts § 388 (1965)) or strict liability (Restatement (Second) of Torts § 402A (1965)).

¶ 24        Section 388, which governs products-liability actions premised on negligence, provides as follows:

> "One who supplies directly or through a third person a
> chattel for another to use is subject to liability to those whom the
> supplier should expect to use the chattel with the consent of the

- 5 -

other or to be endangered by its probable use, *for physical harm* caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Emphasis added.) Restatement (Second) of Torts § 388 (1965).

¶ 25 Likewise, section 402A(1), which governs products-liability actions premised on strict liability, provides as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability *for physical harm* thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." (Emphasis added.) Restatement (Second) of Torts § 402A(1), at 347-48 (1965).

¶ 26    The Supreme Court of Illinois has adopted section 388 (*Busch v. Graphic Color Corp.*, 169 Ill. 2d 325, 334 (1996)) and section 402A (*Lamkin v. Towner*, 138 Ill. 2d 510, 528 (1990); *Suvada v. White Motor Co.*, 32 Ill. 2d 612, 621 (1965)) without modification or qualification. By so doing, the supreme court necessarily adopted the meanings that terms have in those sections.

¶ 27    "Physical harm" has a particular meaning in the Restatement (Second) of Torts. The term is defined in section 7(3) of chapter 1, a chapter entitled "Meaning of Terms Used Throughout the Restatement of Torts." We will quote section 7 in full to show how "physical harm" or, more generally, "harm" is different from an "injury":

"(1) The word 'injury' is used throughout the Restatement of this Subject to denote the invasion of any legally protected interest of another.

(2) The word 'harm' is used throughout the Restatement of this Subject to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause.

(3) The words 'physical harm' are used throughout the Restatement of this Subject to denote the physical impairment of the human body, or of land or chattels." Restatement (Second) of Torts § 7 (1965).

¶ 28    Thus, section 7 specially defines three terms: "injury"; "harm"; and "physical harm," which is a type of "harm," *i.e.*, a physically impairing loss or detriment. Why does the Restatement draw a distinction between an "injury" and "harm"? The reason is that, in some circumstances, the common law recognizes a cause of action for conduct that invades or

"injures" a legally protected interest, even though the conduct causes no harm. An innocuous or beneficial trespass to land is one example. *Id.* An assault—drawing back as if to deliver a punch but stopping short of delivering it—is another example of an "injury" in the absence of "harm." *Id.*

¶ 29 Unlike the victim of an assault, Joseph Sondag has experienced an alteration to the structure of his body: he has pleural plaques and interstitial fibrosis. As comment b to section 7 explains, however, "harm" means more than an alteration to the structure of one's body. " 'Harm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object[,] or thing. Physical changes or alterations may be either beneficial, detrimental, or of no consequence to a person. In so far as physical changes have a detrimental effect on a person, that person suffers harm." Restatement (Second) of Torts § 7 cmt. b, at 13 (1965).

¶ 30 It appears from the record that the pleural plaques and interstitial fibrosis are asymptomatic. They have caused no physically impairing loss or detriment to Joseph Sondag. Although no one wants pleural plaques and interstitial fibrosis, we do not see how these conditions have affected him in any practical, functional way. He has no pulmonary symptoms. It appears that, but for the X-ray and CT scan, he would have remained blissfully unaware of any condition in his lungs. The results of his pulmonary function test were "excellent," according to his treating physician, Rossi. He just has abnormal lung X-rays.

¶ 31 If, by *battering* Joseph Sondag, someone had caused him to develop these asymptomatic pleural plaques and this interstitial fibrosis, he would have a cause of action against the batterer for "a violation of [his] right to freedom from the intentional infliction of offensive bodily contacts." Restatement (Second) of Torts § 15 cmt. a, at 27 (1965). Despite the

lack of clinical symptoms, Joseph Sondag, as the victim of a battery, would have suffered "bodily harm" as defined in section 15 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 15 (1965)). A victim of an offensive bodily contact, a battery, suffers "bodily harm" if the contact alters the victim's body in any way—even if the alteration is physically beneficial, such as a surgeon's unauthorized removal of a wart. Restatement (Second) of Torts § 15 cmt. a, at 27 (1965).

¶ 32 But the complaint in this case alleges products liability, not battery, and "bodily harm" is relevant only to battery. Section 15 of the Restatement, which defines "bodily harm," is in topic 1, "The Interest in Freedom From Harmful Bodily Contact"; which in turn is in chapter 2, "Intentional Invasions of Interest in Personality"; which in turn is in division one, "Intentional Harms to Persons, Lands, and Chattels." Section 7(3), by contrast, which defines "physical harm," is in chapter 1 of division one, a chapter entitled "Meaning of Terms Used Throughout the Restatement of Torts." Because "bodily harm" has a more limited applicability than "physical harm," and because the terms are separately defined in different contexts, they are not synonymous. A cause of action for products liability requires not "bodily harm" but "physical harm" (Restatement (Second) of Torts §§ 388, 402A(1) (1965)), a physically impairing loss or detriment (Restatement (Second) of Torts § 7(2), (3) (1965)). We see no evidence that the pleural plaques and interstitial fibrosis that showed up in Joseph Sondag's X-rays are, to him, a physically impairing loss or detriment.

¶ 33 Granted, Julie Grant and Phyllis Sondag testified they had noticed Joseph Sondag suffering from shortness of breath, but we are aware of no evidence that the pleural plaques and interstitial fibrosis had caused these episodes of shortness of breath. After all, Joseph Sondag is

82 years old, and he has been a smoker. And despite that, he has an "excellent diffusion capacity."

¶ 34        Plaintiffs might counter that Joseph Sondag would have been even healthier had he not been exposed to defendant's asbestos-containing tape. Allegedly, in the course of his work as a plasterer, he inhaled asbestos fibers from the tape, and these asbestos fibers made lacerations inside his lungs. Interstitial fibrosis is a scarring of alveoli, tiny air sacs in the lungs, and, necessarily, any air sac that is scarred cannot do its work of carrying oxygen into the bloodstream. So, with the scarring of each air sac, there is an incremental loss of function in the sense that the particular air sac ceases to function.

¶ 35        The problem with such reasoning is that there are hundreds of millions of air sacs in the lungs and saying that "physical harm" begins with the scarring of any one of these air sacs would tend to divest "harm" of its practical meaning. To qualify as "physical harm," the alteration of the body must have a detrimental effect in a more practical sense, such as by causing noticeable respiratory symptoms. See *Ackison v. Anchor Packing Co.*, 897 N.E.2d 1118, 1125 (Ohio 2008); *Giffear*, 632 A.2d at 887-88; *Owens-Illinois v. Armstrong*, 591 A.2d 544, 561 (Md, Ct. Spec. App. 1991), *aff'd in part and rev'd in part on other grounds*, *Owens-Illinois, Inc. v. Armstrong*, 604 A.2d 47 (Md 1992); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 4, Reporters' Note to cmt. c, at 59-60 (2010) ("An unfortunate and aberrational exception to the self-correction of small or trivial harms explained in this Comment is asbestos claims by plaintiffs who suffer no clinical symptoms but who have abnormal lung X-rays, a condition known as pleural plaque. *** Some courts have responded by requiring that an asbestos plaintiff prove the existence of clinical symptoms before sufficient bodily injury exists.").

¶ 36    Joseph Sondag has only abnormal lung X-rays, with no clinical symptoms. Because plaintiffs presented no evidence of "physical harm"—an essential element of their cause of action (see *A, C & S*, 131 Ill. 2d at 443; *Woodill*, 58 Ill. App. 3d at 355; Restatement (Second) of Torts § 388 (1965))—the trial court should have granted defendant's motion for a directed verdict. See *Ramos v. Pyati*, 179 Ill. App. 3d 214, 221 (1989); *Rowe v. Illinois Power Co.*, 154 Ill. App. 3d 174, 178 (1987). Of course, we are supposed to regard all the evidence in the light most favorable to plaintiffs (see *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)), but plaintiffs presented no evidence of "physical harm" that we could regard in a light most favorable to them. Therefore, a verdict in their favor could not possibly stand. See *id.*

¶ 37                                III. CONCLUSION

¶ 38    For the foregoing reasons, we reverse the trial court's judgment.

¶ 39    Reversed.

¶ 40        JUSTICE HARRIS, specially concurring in part, dissenting in part.

¶ 41        I agree that a portion of the jury's verdict should be reversed.   However, I respectfully disagree with the majority's invocation of section 388 of the Restatement (Second) of Torts and its corresponding analysis of damages in this case for two reasons.

¶ 42        First, the majority premises its analysis on the assumption the jury awarded damages based on the mere presence of pleural plaques and interstitial fibrosis in Joseph Sondag's lungs.  It then finds these conditions do not constitute a "physical harm" as defined by the Restatement (Second) of Torts because they did not have a detrimental effect.   However, plaintiffs did not request damages simply for the changed condition of Joseph Sondag's lungs. Instead, they requested damages for specific claims of actual harm.  Joseph Sondag claimed a shortened life expectancy, loss of a normal life, and pain and suffering.  Phyllis Sondag claimed the loss of Joseph Sondag's society and companionship as well as medical expenses.  I would find that except for the requested medical expenses, the jury's award of damages was simply unsupported by the evidence.

¶ 43        The only testimony suggesting Joseph Sondag was symptomatic came from family members who commented on his shortness of breath.   However, there was no expert testimony establishing a causal link between the family's observations and Joseph Sondag's asbestosis.  In my view, this was a case where expert testimony was necessary to establish a link between the two given the complexity of Joseph Sondag's medical and smoking history.  *See Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 59 (2000) (expert testimony was necessary in order to establish a relationship between two separate injuries).   Ultimately, the record contains no evidence that Joseph Sondag has or will experience a shortened life expectancy, loss of a normal life, or pain and suffering.  Because Phyllis Sondag's claim of loss of society and companionship

is derivative of Joseph Sondag's claims, it too fails due to a lack of supporting evidence. In my view, the jury's award of damages for these unsupported claims should be reversed on that simple basis.

¶ 44    Second, the majority holds that a plaintiff in a products liability action based on negligence must establish "physical harm" as defined in section 7(3) of the Restatement (Second) of Torts. While the majority correctly notes section 388's use of the term "physical harm," it proceeds to analyze Joseph Sondag's lung condition using the separately defined term, "harm." However, the term "harm" does not appear in the text of section 388. Section 388 refers only to "physical harm." In the context of the definition of "physical harm" in section 7, comment e to that section states as follows:

> "e. *Physical harm.* The words 'physical harm' are used to denote physical impairment of the human body, or of tangible property, which is to say land or chattels. *Where the harm is impairment of the body, it is called 'bodily harm,' as to which see § 15.*"
>
> (Emphasis added.) Restatement (Second) of Torts § 7 cmt. e (1965).

Here, I note my disagreement with the majority's assertion "bodily harm" is "relevant only to battery." Indeed, the authors of section 388 specifically refer to "bodily harm" in comment e, "Ambit of liability," where the term "bodily harm" is used interchangeably with "physical harm." Restatement (Second) of Torts § 388 cmt. e (1965). Continuing with my analysis, section 15 states: "Bodily harm is any physical impairment of the condition of another's body, or physical pain or illness." Restatement (Second) of Torts § 15 (1965). Comment a to section 15 then states, in part:

> "There is an impairment of the physical condition of another's

- 13 -

body *if the structure or function of any part of the other's body*

*is altered to any extent even though the alteration causes no*

*other harm*." (Emphasis added.) Restatement (Second) of Torts

§ 15 cmt. a (1965).

The emphasized portion of comment a above appears to accurately describe the condition of pleural plaques and interstitial fibrosis in Joseph Sondag's lungs. They are changes to the structure of his lungs, even though they have "cause[d] no other harm." Thus, it appears Joseph Sondag suffered a "bodily harm" (as defined in section 15), which is a form of "physical harm" as defined in section 7 and used in section 388. If this is correct, then contrary to the majority's analysis, the "physical harm" requirement in section 388 was met by plaintiffs. However, as noted above, Joseph Sondag did not request an award of damages based on the mere presence of these conditions in his lungs, and so, in my view, the issue of whether he suffered a "physical harm" pursuant to section 388 is academic.

¶ 45          I also dissent in part from the majority's reversal of the judgment. As I previously explained, the evidence fails to support the jury's verdict for plaintiffs except for its award of medical expenses. In a single line on the verdict form, the jury awarded damages to Phyllis Sondag in the total amount of $70,000. Phyllis Sondag claimed damages for the loss of Joseph Sondag's society and companionship as well as medical expenses. Based on my review of the record, I find plaintiffs presented sufficient evidence to justify an award of $67,000 for medical expenses. Dr. Rossi testified about the medical monitoring of Joseph Sondag's lung condition with chest X-rays and CT scans and the recommended annual monitoring in the future. In closing argument, plaintiffs' counsel suggested an award of $67,000 for medical expenses and

explained how he arrived at this amount. Here, the evidence supported only an award for medical expenses in the amount of $67,000, and I would reduce the judgment accordingly.